[Nos. 43870-4-II; 43990-5-II.   Division Two.   December 2, 2014.]

THE STATE OF WASHINGTON, *Respondent*, v. KISHA LASHAWN FISHER, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. COREY TROSCLAIR, *Appellant*.

*Stephanie C. Cunningham*; and *Kathryn A. Russell Selk* (of *Russell Selk Law Office*), for appellants.

*Mark E. Lindquist, Prosecuting Attorney*, and *Kimberley A. DeMarco, Deputy*, for respondent.

¶1 JOHANSON, C.J. — A jury found Kisha Fisher and Corey Trosclair guilty of first degree murder.[1] Trosclair and Fisher appeal their convictions. In the published portion of the opinion, we hold that Trosclair's rights under the confrontation clause of the Sixth Amendment to the United States Constitution were violated because the redactions in a nontestifying codefendant's statements were insufficient under current confrontation clause jurisprudence. But we hold further that the error was harmless beyond a reasonable doubt. Therefore, although the trial court should have severed Trosclair's case from Fisher's, the court's refusal to do so does not require reversal. In the unpublished portion of the opinion, we address Trosclair's and Fisher's remaining claims and affirm their convictions.

## FACTS

### I. THE SHOOTING INVESTIGATION

¶2 In January 2011, Lenard Masten received a fatal gunshot wound at an apartment complex in Lakewood.

---

[1] RCW 9A.32.030(1)(c).

Several apartment residents heard the gunshot. Michelle Davis,[2] Masten's girlfriend, said that Masten had received a telephone call regarding a drug sale. After he left, Michelle[3] heard a loud noise and saw one man standing over Masten while another man ran up the stairs toward Masten's apartment. Nadise Davis described a similar scene. Nadise heard the gunshot, looked out the window, and saw a man standing over Masten cursing loudly and digging through Masten's pockets. Nadise also saw a second man with a gun coming down a stairwell. Aaron Howell heard the gunfire and saw a man in a dark-colored sport utility vehicle leave the area. Howell subsequently identified Trosclair from a photomontage as the man he had seen the night Masten was murdered.

¶3 Masten's cell phone records revealed pertinent information. The records showed numerous calls between Mario Steele and Masten on the day Masten was killed, including a three-way phone call between Steele, Masten, and Trosclair three minutes before Masten was shot. Cell phone records also placed Trosclair in the same Lakewood neighborhood as Steele and Masten during the three-way call.

¶4 Investigator Jeff Martin interviewed Fisher, Steele's girlfriend and Trosclair's sister, who admitted that she called Masten to set up a drug deal for Steele. Fisher acknowledged that Steele and "two guys" went to purchase cocaine from Masten around 3:00 PM and that they were supposed to meet with Masten again later. 14 Report of Proceedings (RP) at 1610. Fisher also admitted to calling Masten and connecting him on the three-way call with Steele.[4] She initially denied knowing of a robbery plan, but

---

[2] Michelle Davis died in an unrelated incident before trial but made statements to police that the trial court appears to have admitted as excited utterances.

[3] Michelle shares a surname with several family members who testified in this case. We identify members of the Davis family by their first names for clarity, intending no disrespect.

[4] The record is somewhat unclear on this point, but it appears that Steele was using Trosclair's phone for this call.

she later admitted that she knew "they talked about [robbing Masten]." 14 RP at 1619.

## II. Motion To Sever

¶5 The State charged Fisher and Trosclair each with one count of first degree felony murder and one count of second degree felony murder. Before trial, Fisher and Trosclair moved under CrR 4.4(c)(1) to sever their cases because the State planned to introduce Fisher's interview transcript that referred to Trosclair by name throughout. The State proposed to substitute the phrase "the first guy" in place of Trosclair's name. But Trosclair believed that the use of "the first guy" was an insufficient redaction. The trial court allowed the proposed redactions and denied the motion to sever.

## III. Trial

¶6 Witnesses testified consistently with the facts as set forth above. In addition, Joseph Adams, who was incarcerated in the Pierce County jail on an unrelated crime, testified at trial in exchange for a considerable reduction of his own prison term. Coincidentally, Trosclair had been placed in the same jail unit as Adams, who was Masten's close friend.

¶7 According to Adams, Trosclair told him that he and Steele planned to rob Masten because they believed Masten had tried to "cheat" them earlier that day by selling them poor quality cocaine. 12 RP at 1338. Trosclair told Adams that someone called Masten to "set up a deal" while Trosclair and Steele waited in the parking lot. 12 RP at 1339. Trosclair explained that they "ran up on [Masten]" as he was getting into his car and that Trosclair shot Masten when Masten got "loud" and reached for the gun. 12 RP at 1339. Trosclair then described his attempt to gain access to Masten's apartment and his search of Masten's person "to see what [Masten] had," before running from the scene when someone noticed him. 12 RP at 1339.

¶8 Neither Fisher nor Trosclair testified. The jury found Fisher and Trosclair guilty of first degree and second degree murder. The trial court dismissed the second degree murder convictions to circumvent double jeopardy concerns. Fisher and Trosclair appeal.

## ANALYSIS

### SEVERANCE AND THE CONFRONTATION CLAUSE

¶9 Trosclair argues that the trial court should have severed his trial from Fisher's because the redactions to Fisher's interview transcript were insufficient and, therefore, violated Trosclair's Sixth Amendment right to cross-examination. We hold that the redactions were insufficient under *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), and its progeny. We conclude, however, that any error was harmless.

### A. STANDARD OF REVIEW AND RULES OF LAW

¶10 We review alleged violations of the state and federal confrontation clauses de novo. *State v. Medina*, 112 Wn. App. 40, 48, 48 P.3d 1005, *review denied*, 147 Wn.2d 1025 (2002). The confrontation clause guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. CONST. amend. VI. A criminal defendant is denied the right of confrontation when a nontestifying codefendant's confession that names the defendant as a participant in the crime is admitted at a joint trial, even where the court instructs the jury to consider the confession only against the codefendant. *Bruton*, 391 U.S. at 135-36. But no violation of the confrontation clause occurs by the admission of a nontestifying codefendant's confession with a proper limiting instruction and where the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence. *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987).

Any such redaction must be more than an obvious blank space or other similarly obvious indications of alteration. *Gray v. Maryland*, 523 U.S. 185, 192, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998).

¶11 To comply with the *Bruton* rule, our Supreme Court adopted CrR 4.4(c), which provides,

(1) A defendant's motion for severance on the ground that an out-of-court statement of a codefendant referring to him is inadmissible against him shall be granted unless:

(i) the prosecuting attorney elects not to offer the statement in the case in chief; or

(ii) deletion of all references to the moving defendant will eliminate any prejudice to him from the admission of the statement.

Under this rule, the issue is whether the proposed redactions to a codefendant's statement are sufficient to eliminate any prejudice to the defendant.

## B. Admission of Redacted Transcript

¶12 Trosclair alleges that the transcript contained several statements that allowed the jury to conclude that "first guy" could not have been anyone other than Trosclair. These included Fisher's statements (1) that "first guy" did not have a car, (2) that "first guy" lived in Kent, (3) that "Mario," the "first guy," and an unknown man from California went to purchase drugs from Masten, (4) that Fisher knew that the case was serious because "first guy" and Steele were already in jail as suspects, and (5) that implied that "first guy" was related to Fisher because when she was asked whether a third party was related to "first guy," she answered, "No relation to my family" when the jury had already heard that Fisher and Trosclair were brother and sister. Br. of Appellant (Trosclair) at 23.

¶13 In some cases, we have upheld the use of properly redacted statements. For example, in *State v. Cotten*, Bryan

Cotten contended that the trial court erroneously allowed witnesses to testify regarding various out-of-court statements made by Cotten's codefendant that implicated Cotten in the crimes. 75 Wn. App. 669, 690, 879 P.2d 971 (1994), *review denied*, 126 Wn.2d 1004 (1995). We disagreed, holding that evidence of statements made by Cotten's nontestifying codefendant were admissible because they did not implicate, name, or even acknowledge the existence of Cotten as an accomplice. *Cotten*, 75 Wn. App. at 691. Similarly, in *Medina*, Division One of this court held that admission of incriminating statements made by a codefendant did not deprive Raul Medina of his right of confrontation when the statements were redacted to refer to the other participants in the crime as "other guys," "the guy," "a guy," "one guy," and "they." 112 Wn. App. at 51. Notwithstanding the fact that only three persons were charged, the testimony established that there were as many as six individuals involved. *Medina*, 112 Wn. App. at 51. The *Medina* court concluded that no *Bruton* violation occurred because the statements were redacted in such a way that it became impossible to track the activities of any particular "guy" among the several involved. 112 Wn. App. at 51. Therefore, the references to "the guys" and "a guy" did not create the inference of identification of Medina or the third codefendant. *Medina*, 112 Wn. App. at 51.

¶14 In contrast, we have found violations of the *Bruton* rule when a trial court admitted incriminating statements of a codefendant despite the fact that those statements had been redacted to eliminate the defendant's name. For instance, in *State v. Vannoy*, police officers observed three suspects fleeing the scene of a robbery. 25 Wn. App. 464, 473, 610 P.2d 380 (1980). Following a high-speed pursuit, three men were arrested, including Thomas Vannoy. *Vannoy*, 25 Wn. App. at 473-74. Vannoy's two codefendants both made statements describing the events to law enforcement using a series of " 'we's' " to refer to the group. *Vannoy*, 25 Wn. App. at 473. This court reversed Vannoy's con-

viction when it concluded that a jury, after hearing the redacted confessions and facts of the case, could readily determine that Vannoy was included in the " 'we's' " of the codefendants' statements. *Vannoy*, 25 Wn. App. at 474-75.

¶15 And in *State v. Vincent*, the State charged Vidal Vincent with attempted murder and assault stemming from a drive-by shooting. 131 Wn. App. 147, 150, 120 P.3d 120 (2005), *review denied*, 158 Wn.2d 1015 (2006). As he awaited trial, Vincent's codefendant confessed to Jason Speek, another jail inmate, simultaneously incriminating Vincent. *Vincent*, 131 Wn. App. at 150-51. Over Vincent's objection, the trial court allowed the State to introduce the codefendant's statements via Speek's testimony, provided that all references to Vincent were omitted. *Vincent*, 131 Wn. App. at 151. Speek testified that Vincent's codefendant told him that the codefendant and "the other guy" had been involved in an earlier gang fight and that when they returned to the scene, the codefendant shot the victim. *Vincent*, 131 Wn. App. at 155. We held that the admission of Speek's testimony violated Vincent's rights under *Bruton* because there were only two participants in the crime and Speek testified that there was only one "other guy" with the codefendant before, during, and after the shooting. *Vincent*, 131 Wn. App. at 154. Consequently, we concluded that the only reasonable inference the jury could have drawn after hearing Speek's testimony was that Vincent was the "other guy." *Vincent*, 131 Wn. App. at 154.

■ ¶16 Here, the State argues that Fisher's statement was sufficiently redacted because she implicated three men as participants in the crime and, therefore, there was more than one possibility regarding "first guy's" identity. We disagree. Although these statements appear facially neutral, the record reveals that the jury could easily infer that "first guy" was Trosclair. Accordingly, this case is analogous to *Vannoy* and *Vincent* and distinguishable from *Cotten* and *Medina*. Even though Fisher implicated as many as three participants in the crimes, one of the three men was Steele,

who was named at all times throughout the transcript. The two remaining participants were "first guy" and an unknown man from California. Fisher said that she had never seen the man from California before the day of the crime and had not seen him since.

¶17 Meanwhile, Fisher provided several identifying details about "first guy" that revealed her personal knowledge regarding where "first guy" resides, how frequently "first guy" visits Fisher, and whether he owns a car. Significantly, when Fisher was asked whether the man from California was related to the "first guy," she responded, "No relation to my family." 14 RP at 1615. By this point the jury had already heard that Trosclair lived in Kent and that he was Fisher's brother.

¶18 As the *Gray* Court noted, there are some statements that, despite redactions, "obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately." 523 U.S. at 196. Here, as in *Vincent*, the only reasonable inference the jury could have drawn was that Trosclair was "first guy." Although the trial court provided the necessary limiting instruction, the use of Fisher's redacted statement violated Trosclair's confrontation rights under *Bruton* and its progeny. Accordingly, we hold that the trial court erred in denying Trosclair's motion to sever based on the inadequately redacted statement.

## C. HARMLESS ERROR

¶19 A confrontation clause error is subject to the constitutional harmless error test. Such an error is harmless if the evidence is overwhelming and the violation so insignificant by comparison that we are persuaded beyond a reasonable doubt that the violation did not affect the verdict. *Vincent*, 131 Wn. App. at 154-55. Here, the State's untainted evidence of Trosclair's guilt was strong. Cell phone records placed Trosclair with Steele at the scene and

in contact with Masten moments prior to the shooting. An eyewitness identified Trosclair as one of the perpetrators from a photomontage. Moreover, Trosclair confessed his guilt to a fellow inmate, providing details that were unknown to anyone other than members of law enforcement. We hold that the violation of Trosclair's confrontation right was harmless beyond a reasonable doubt. Accordingly, we hold that the trial court's denial of Trosclair's motion to sever his trial from Fisher's does not warrant reversal and affirm.

¶20 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

WORSWICK and MELNICK, JJ., concur.

After modification, further review denied March 17, 2015.

Additional motions for reconsideration denied January 8 and March 11, 2015.

Review granted for State and for defendant Fisher and review denied for defendant Trosclair at 183 Wn.2d 1024 (2015).