# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 73933-6-I |
| LISA MERIE CONKLIN, n/k/a/ CHRISTENSEN, | ) ) | DIVISION ONE |
| Respondent, | ) ) | UNPUBLISHED OPINION |
| v. | ) ) | |
| NICHOLAS FREDERICK CONKLIN, | ) ) | |
| Appellant. | ) ) | FILED: November 9, 2015 |

APPELWICK, J. — Conklin appeals the trial court's order modifying the parenting plan for his son, D.C. Substantial evidence supports a finding that a substantial change of circumstances in D.C.'s life had occurred. Substantial evidence supports the changes in the residential schedule and the restrictions on Conklin's role in D.C.'s life. The modified parenting plan is in the best interests of D.C. We affirm.

## FACTS

Lisa Christensen and Nicholas Conklin were married in February 2008. They had a child together, D.C. Lisa and Nicholas[1] separated in January 2009

---

[1] We refer to the parties by their first names for clarity. No disrespect is intended.

when D.C. was about one and a half years old. Lisa filed for dissolution after a very short marriage. In June 2009, the parties obtained a temporary parenting plan. D.C. resided with his mother a majority of the time under the temporary parenting plan. The temporary parenting plan afforded Nicholas visitation with D.C. every other weekend.

The temporary parenting plan was in effect until D.C. turned three. D.C. hit all of the expected physical, emotional, and developmental milestones during this time. D.C. was a happy, healthy child with a pleasant demeanor, not showing violent tendencies. And, D.C. was potty trained.

The permanent parenting plan went into effect December 30, 2010. The permanent parenting plan was a "50/50" parenting plan. D.C. was to spend one week with his mother and the next with his father. Major decisions regarding D.C.'s education, nonemergency health care, and religious upbringing were to be made jointly.

Despite the provision for joint decision making, Lisa and Nicholas were unable to reach a joint decision about which school D.C. should attend for kindergarten. The court had to resolve the dispute.

D.C. began to exhibit behavioral problems. D.C. struggled behaviorally in daycare. D.C. was aggressive, he hid under tables in fear after getting in trouble, he threw toys, and he hit teachers and other kids. And, D.C.'s potty training reverted such that he was soiling himself frequently.

Lisa worked with D.C.'s school to try to improve D.C.'s behavior. Nicholas would not assist in implementing any strategies to help improve D.C.'s behavior.

Because of the disputes between Lisa and Nicholas, and because of D.C.'s bad behavior, Lisa sought to begin coparent counseling with Nicholas. Nicholas did not voluntarily engage in the coparenting process and dodged Lisa's attempts to talk about going to counseling. Lisa asked the court to order coparent counseling. On July 24, 2012, the court ordered that Lisa, Lisa's current husband, Nicholas, and D.C. participate in coparent counseling to address D.C.'s behavioral issues, to reduce conflict, and improve communications between the parties. They began coparent counseling in November 2012 during D.C.'s kindergarten year.

D.C. was suspended several times in kindergarten for being violent to children and destroying school property. Reports from his kindergarten teacher were that D.C. was unable to recover from having a bad day, he hit kids on the playground, he hit teachers, he took toys from other kids, and he continued to wet himself. His kindergarten teacher concluded that D.C. was abnormal for a boy his age.

Lisa tried many strategies to improve D.C.'s behavior. She had him tested for ADHD (attention deficit hyperactivity disorder), took D.C. to appointments with his primary care physician, took D.C. for behavioral assessment at Seattle Children's Hospital, and attended parent-teacher conferences.

Nicholas continued to resist coparent counseling. Nicholas resisted all potential strategies to improve D.C.'s behavior. Nicholas withheld information in coparenting sessions. And, D.C.'s negative behavior continued. As a result, the coparenting counselor, Dr. Alysa Ruddell, wrote a letter on April 30, 2013, suggesting that D.C. should have more stability in his home life. She suggested

3

that D.C. reside with only Lisa for six weeks, with only visits with Nicholas. She also suggested that D.C. begin counseling with a child therapist. Nicholas opposed the idea of D.C. beginning individual counseling.

In order to carry out Dr. Ruddell's recommendation, Lisa filed a petition for modification of the parenting plan on May 17, 2013. The petition and attached declaration stated that a 50/50 parenting plan was not appropriate because of continuing conflict between the parties. It stated that Lisa tried to decrease the conflict through coparent counseling, but Nicholas has resisted and undermined the process. It further stated that D.C. was exhibiting disturbing and violent behavior and that other interventions had already been attempted without success. And, it highlighted Nicholas's refusal to allow D.C. to participate in individual counseling. It also highlighted why D.C.'s home life would be more stable with Lisa than with Nicholas. Lisa requested that the court find adequate cause for hearing the petition to modify the parenting plan.

After filing the petition for modification of the parenting plan, Lisa became concerned that Nicholas had sexually abused D.C. On May 31, 2013, D.C. had a very bad day at school. D.C. bit a child so hard, it made the other child bleed, and he ran away when staff tried to talk to him. Later that day, at home, Lisa found D.C. in the bathroom with his finger in his bottom covered with feces. Shortly thereafter, Lisa asked D.C. why he had been angry at school. And, she asked D.C. questions about whether Nicholas was sexually abusing him. D.C. made a disclosure that Nicholas touched him with his penis. Lisa recorded D.C. making

his statements. Later that night, Lisa contacted the police and called Child Protective Services (CPS).

Lisa filed an ex parte restraining order against Nicholas on June 4, 2013. She asked for a restraining order until Nicholas completed a forensic interview and asked for an investigation by a Guardian Ad Litem (GAL). The trial court entered a temporary restraining order that same day.

In the wake of D.C.'s initial alleged disclosure to his mother, both law enforcement and CPS investigated the sexual abuse allegations. During an interview through the Kent Police Department, D.C. stated that Nicholas had "touched his peter to my peter." And, D.C. defined "peter" as the "private part he goes pee out of."

The Kent Police Department ultimately declined to prosecute, because it did not have enough evidence. D.C. was five at the time and was unable to expand in more detail. And, Nicholas declined to take a polygraph test during the investigation. CPS ultimately closed the case, because it was concerned that Lisa was coaching D.C. by asking him questions about potential sexual abuse and by recording D.C. making the statements. CPS noted that despite its closing the case, D.C. was safe because he spent his time with mandatory reporters, that there was a GAL appointed, and that Lisa had already initiated a modification proceeding regarding the current parenting plan.

After that incident, D.C. made three additional disclosures of sexual abuse. He made one disclosure at the YMCA. He claimed that his cousin had sexually abused him and that his parents refused to intercede. And, he made two other

5

disclosures of sexual abuse to his licensed family therapist, Amy Crook. He made the first disclosure during his first session with Crook. D.C. said that his father touched "my peter with his peter." After several more therapy sessions, D.C. described the abuse in more detail. D.C. stated that Nicholas put his "peter" and his finger inside D.C.'s butt. Crook eventually diagnosed D.C. with posttraumatic stress disorder (PTSD). And, she concluded that D.C.'s behaviors were consistent with children who have been the victims of sexual abuse.

D.C. started first grade in September 2013, after about three months of no-contact with Nicholas. At the beginning of the school year, D.C.'s behavior had not improved, and it was still very disruptive. D.C.'s poor behavior continued through January 2014. Starting in February 2014, D.C.'s behavior in school improved tremendously. He no longer threw fits, and he was able to get his work done. While he was still struggling, the degree of violence had lessened, and he was more emotionally stable.

Trial commenced on Lisa's petition to modify the parenting plan in June 2014. On July 11, 2014, the trial court ordered that the parenting plan be modified because of a substantial change of circumstances and because the modification was in the best interests of the child. The trial court entered findings supporting its decision based both on the sexual abuse allegations and based upon the ongoing conflict between Lisa and Nicholas.

The trial court also entered the final parenting plan on July 11, 2014. It stated that D.C. should have no contact with Nicholas until Nicholas satisfied several requirements. Specifically, the court ordered Nicholas to undergo a

psychosexual evaluation within 90 days, including a polygraph evaluation. It stated that Nicholas could voluntarily undergo a plethysmograph, but that the court would not require one. The court stated that after the psychosexual evaluation is completed, there would be a review hearing to determine whether contact with D.C. should be restricted permanently. But, if the court believes contact with Nicholas should resume, Nicholas should work with a reunification therapist and Crook to develop a reunification plan with D.C. Because of the modification of the parenting plan, the trial court also ordered that Nicholas pay child support.

Nicholas moved for reconsideration on both July 21, 2014 and September 8, 2014 arguing, among other things, that Lisa coached D.C. to make the sexual abuse allegations and that the trial court's decision was not based on concrete evidence that he abused D.C.. The trial court denied both motions. Nicholas appeals.

DISCUSSION

Nicholas makes several arguments on appeal. He argues that the trial court erred when it modified the parenting plan. He appears to base this argument on the fact that there is not substantial evidence in the record supporting a finding of sexual abuse. Consequently, he asserts that the trial court should have ordered that he be psychosexually evaluated prior to entering a finding of sexual abuse. He further argues that the trial court erred when it considered inadmissible evidence in the modification hearing. And, he contends that his constitutional rights were violated when he was ordered to undergo a psychosexual evaluation. Finally, he contends that he is entitled to attorney fees on appeal.

Nicholas first argues generally that the trial court erred when it modified the original parenting plan. Changes in where children reside a majority of the time are viewed as highly disruptive to children, and there is a strong presumption in favor of continuity and against modification. In re Marriage of McDole, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993). Nonetheless, trial courts are given broad discretion in matters dealing with the welfare of children. Id. A trial court's decision will not be reversed on appeal unless the court exercised its discretion in an untenable or manifestly unreasonable way. Id. Parenting plan modifications require a two-step process that is outlined in RCW 26.09.260 and .270. In re Marriage of Zigler, 154 Wn. App. 803, 809, 226 P.3d 202 (2010).

I. Adequate Cause Requirement for Modification Met

First, a party moving to modify a parenting plan must produce an affidavit showing adequate cause for modification before the court will permit a full hearing on the matter. RCW 26.09.270. The information considered by the trial court in deciding whether a hearing is warranted should be new information that was not considered in the original parenting plan. Zigler, 154 Wn. App. at 809. The court shall deny the motion without a hearing unless the affidavit establishes "adequate cause" to set a hearing. In re Marriage of Lemke, 120 Wn. App. 536, 540, 85 P.3d 966 (2004). At the very minimum, "adequate cause" means evidence sufficient to support a finding on each fact that the movant must prove in order to modify. Id.

In this case, Lisa's declaration had to support findings (1) that there was a substantial change in the circumstances of D.C. and/or Nicholas since the entry of the original parenting plan and that the modification is in D.C.'s best interests and

8

(2) that D.C.'s environment under the parenting plan—the split between the two parents' homes—was detrimental to his physical, mental or emotional health and the harm likely to be caused by a change in environment was outweighed by the advantage of a change. RCW 26.09.260(1); RCW 26.09.260(2)(c); see Lemke, 120 Wn. App. at 540-41.

We review a trial court's RCW 26.09.270 adequate cause determination based on submitted affidavits for abuse of discretion. In re Parentage of Jannot, 149 Wn.2d 123, 126, 65 P.3d 664 (2003).

Lisa filed her petition on May 17, 2013 based on the fact that she and Nicholas had a continuing conflict, Nicholas refused to engage in coparenting, Nicholas refused to allow D.C. to begin individual counseling, and that she could provide a more stable environment for D.C. Lisa included her declaration with the petition. In it, she described how D.C.'s behavior negatively changed after the parenting plan was entered in December 2010. She described how she sought to engage in coparent counseling to work out issues with Nicholas and because of D.C.'s behavioral issues. She stated that Nicholas resisted and undermined the counseling and potential individual counseling for D.C.. Her declaration outlined the escalation of D.C.'s bad behavior in the months prior to filing the petition. And, she stated that their coparenting counselor recommended that D.C. reside with only Lisa on a trial basis. She stated that Nicholas' resistance to and lack of cooperation with helping D.C. was preventing her from getting D.C. counseling. Finally, she stated that Nicholas' home is very unstable. Nicholas had changed residences at least three times in the previous year. And, because Nicholas has

to wake up incredibly early for work, D.C.'s sleep schedule was very different at Nicholas' home than at hers. Lisa also informed the trial court that Nicholas had a roommate who, at some point, shared a room with D.C.. And, she explained that now D.C. sleeps with Nicholas. She concluded that living with her full time would provide D.C. more stability and help put him on the right track. On August 5, 2013, the trial court concluded that adequate cause for hearing Lisa's petition had been established.

Lisa's declaration clearly outlines substantial changes in circumstances since the entry of the parenting plan—changes in D.C.'s behavior and changes in Nicholas' living situation. And, the onset of the split living arrangements coincided with D.C.'s behavioral difficulties and was detrimental to his emotional health. We conclude that, based on Lisa's declaration, even before any allegations of sexual abuse surfaced, the trial court did not abuse its discretion when it made a finding of adequate cause to warrant a full hearing on the petition for a modification.

II. Requirements for Modification Met

Under the second step of the modification process, if the moving party establishes adequate cause and the court holds a full hearing, the court may then modify the existing parenting plan if it finds that (1) a substantial change occurred in circumstances as they were previously known to the court, (2) the present arrangement is detrimental to the child's health, (3) modification is in the child's best interests, and (4) the change will be more helpful than harmful to the child. RCW 26.09.260(1), (2)(c).

Here the trial court found that all of the factors were satisfied. By the time the trial commenced in June 2014, the sexual abuse allegations and evidence had been brought to the fore. The trial court took into consideration the conflict between Lisa and Nicholas, that D.C. demonstrated signs of being sexually abused, and that D.C. has significant emotional and behavioral issues requiring counseling. But, the trial court predominantly relied on the sexual abuse to satisfy the four factors required to modify. Thus, Nicholas focuses his arguments on attacking both the quality and the quantity of the evidence supporting the finding of sexual abuse.

First, Nicholas makes several arguments challenging the evidence submitted during the modification hearing. He challenges the specific evidence ostensibly to support his argument that substantial evidence does not support the trial court's finding of sexual abuse.

There is no physical evidence of sexual abuse in the record. All of the evidence related to sexual abuse that surfaced during the modification hearing was through Lisa's testimony and the testimony of counselors, therapists, and teachers. Much of that testimony repeated statements D.C. made to them. As such, Nicholas argues the trial court erred when it admitted hearsay from the family coparenting counselor, Dr. Ruddell, and "others." And, he argues that the trial court erred when it considered Lisa's hearsay testimony. But, Nicholas did not object to the admission of hearsay testimony below. It is well settled that objections to evidence cannot be raised for the first time on appeal. RAP 2.5(a); Sepich v. Dep't of Labor & Indus., 75 Wn.2d 312, 319, 450 P.2d 940 (1969).

11

Nicholas also argues that Lisa and the other witnesses were not credible. While we will review the trial court's findings of fact for substantial evidence, this court does not review the trial court's credibility determinations or weigh conflicting evidence. In re Marriage of Rostrom, 184 Wn. App. 744, 750, 339 P.3d 185 (2014). As such, any of Nicholas' challenges to the credibility of the witnesses are not properly before us.

Because Nicholas has not successfully challenged any of the evidence before the trial court,[2] we may consider all of that evidence when determining whether there was substantial evidence for the trial court to find that all four factors needed for modification were satisfied (section 2.2 of the trial court's order).[3]

There was ample evidence at the modification hearing to support the trial court's findings that a substantial change occurred in circumstances since entry of the original parenting plan, that the present arrangement was detrimental to D.C.'s health, that the modification was in D.C.'s best interests, and that a change would be more helpful than harmful to D.C..

---

[2] Nicholas also argues that the trial court violated his constitutional rights when it modified his parental rights based upon inadmissible evidence. We need not address this argument. See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (declining to consider arguments not supported by reference to the record or citation to authority).

[3] Nicholas also contends that there is not substantial evidence in the record supporting the finding in section 2.1 of the trial court's order modifying the parenting plan. Section 2.1 states that the trial court had jurisdiction over the proceeding, because the court had previously entered a parenting plan in the matter and retained jurisdiction. The trial court previously entered a parenting plan in this matter and that parenting plan is in the record. Therefore, there is substantial evidence in the record to support that finding.

First, there was testimony that D.C.'s behavior changed dramatically since the entry of the permanent parenting plan. Lisa testified that prior to the entry of the parenting plan, D.C. was a happy child with a pleasant demeanor. Lisa testified that D.C.'s potty training reverted after the entry of the parenting plan and that D.C. became more aggressive. D.C.'s teachers described D.C. as violent and aggressive to other children. One teacher testified that D.C. destroyed school property. . And, there was testimony that D.C.'s behavior improved significantly when he had no contact with his father. Lisa testified that D.C.'s behavior is "increasingly monumentally better." D.C.'s first grade teacher testified that D.C. has improved both academically and behaviorally since she first started teaching him. Specifically, she testified that D.C. does not throw fits anymore. It is also worth noting that during the period of no contact with Nicholas, D.C. told Crook he hates his father.

Secondly, there was testimony in the record that Nicholas was unwilling to address D.C.'s behavioral problems. Lisa testified that Nicholas would not voluntarily participate in coparenting counseling. She further testified that Nicholas refused to talk about D.C.'s needs and was never involved in implementing any decisions designed to improve D.C.'s behavior. Dr. Ruddell testified that Nicholas would not cooperate in coparent counseling. One of D.C.'s teachers testified that Nicholas constantly made excuses for D.C.'s behavior.

Moreover, there was testimony to support the trial court's finding of sexual abuse. Crook testified that D.C. made very specific and explicit disclosures to her that Nicholas had sexually abused him. And, she concluded that D.C.'s aggressive

13

behavior was consistent with the behavior of other sexually abused children. She diagnosed D.C. with PTSD. She has worked with 20-25 children who have confirmed experiences of sexual abuse. Even without any other evidence in the record,[4] the statements D.C. made to Crook combined with Crook's professional opinion, constitutes substantial evidence to support the trial court's finding of sexual abuse.

Because there was substantial evidence to support a finding of sexual abuse, the trial court did not err when it entered its findings in section 2.2 of the parenting plan. Even disregarding the evidence of sexual abuse, the evidence of D.C.'s behavioral changes and Nicholas's unwillingness to cooperate would be sufficient to satisfy the factors necessary for the modification of the residential schedule and decision making elements of the parenting plan.

III. Other Errors During the Hearing

Nicholas argues that the trial court made two other errors during the modification hearing. First he argues that the trial court erred by testifying in violation of ER 605, ER 602, and ER 702. And, he argues that the trial court erred when it applied the incorrect standard to RCW 26.09.260 modifications.[5]

---

[4] Nicholas cites the GAL's preliminary report as evidence that there should not have been a finding of sexual abuse. The GAL's preliminary report was not admitted at trial. And, the GAL did not testify at trial. But, even if the GAL's preliminary report were admitted at trial, Crook's testimony still constitutes substantial evidence to justify a finding of sexual abuse. This court does not weigh conflicting evidence on appeal. Rostrom, 184 Wn. App. at 750.

[5] Nicholas also assigns error to the trial court's modification of his child support obligation subsequent to modifying the final parenting plan. But, Nicholas does not provide any argument or authority to support this assignment of error. As such, we do not consider it. See Emerson v. Weilep, 126 Wn. App. 930, 939-40, 110 P.3d 214 (2005).

14

A. Trial Court Testimony

Nicholas argues that the trial court erred, because it stated that the allegations are false in only four percent of sexual abuse cases. He argues that the trial court cannot testify as an expert pursuant to ER 602, ER 605, and ER 702. And, he claims that the trial court had no evidence supporting its "testimony." Nicholas provides no additional argument, authority, or citation to the record to support his assertion.

An examination of the record indicates that Nicholas is likely referring to the trial court's response to Nicholas's assertion that sexual abuse allegations are often false. During his testimony, Nicholas stated, "This is a very hard thing to deal with, because I know that this is an ongoing trend in the [c]ourt system now that people are falsely accused." Later, during its ruling, the court commented that sexual abuse allegations are raised in less than five percent of child custody cases. And, that it had not heard a case on its docket for two years where there were child sexual assault allegations in a custody case.

ER 602 and ER 702 relate to the competency of a witness and do not apply here. ER 605 prohibits a presiding judge at a trial from testifying in that trial as a witness. Again, the judge was not testifying. The trial court made this statement in the context of making its ruling. The judge was not serving as a witness or "testifying." Moreover, to the extent the judge was commenting on his personal experience in the court system, this was not improper. See Fernando v. Nieswandt, 87 Wn. App. 103, 108-09, 940 P.2d 1380 (1997) (stating that a trier of

fact may apply common sense to the facts of a dispute to make a decision as long as the comments do not evidence bias, prejudice, or other impropriety).

B. Best Interests of the Child

Nicholas also argues that the trial court erred when it applied the "best interests of the child" standard during the modification hearing. The court's primary concern, when establishing or modifying parenting plans, is to ensure that the best interests of the child are met. RCW 26.09.002; RCW 26.09.260(1); In re Marriage of Stern, 57 Wn. App. 707, 711, 789 P.2d 807 (1990). Nicholas cites to no specific discussion of how the court's consideration of the best interests of the child was erroneous, other than the challenges to the adequacy of the evidence addressed above. We find no error.

IV. Other Errors Related to the Final Order and Final Parenting Plan

Nicholas argues that the trial court erred when it ordered him to undergo a polygraph and psychosexual evaluation. He also contends that the trial court erred when it denied him any contact with D.C.. Finally, he claims that the trial court erred when it granted relief beyond what Lisa initially requested in her petition (termination of visitation rights and findings of sexual abuse).

A. Psychosexual Evaluation and Polygraph

Nicholas argues that the trial court erred when it ordered him to undergo both a

psychosexual evaluation and a polygraph. The trial court found that Nicholas should undergo a psychosexual evaluation with a polygraph to determine the risk of harm should he and D.C. have contact with each other in the future.

16

Nicholas first contends that ordering the psychosexual evaluation after making a finding of sexual abuse is backwards—the evaluation should go first. But, as discussed above, Crook's testimony combined with D.C.'s behavior provided the trial court with substantial evidence to enter its finding of sexual abuse. Crook testified that D.C. stated several times that Nicholas touched him in a sexually inappropriate manner. The trial court then appropriately ordered limitations reasonably calculated to address that identified harm. See RCW 26.09.191(2)(m)(i) (stating that the trial court may impose limitations that are reasonably calculated to protect the child from the sexual abuse or harm that could result, such as supervised contact between the child and the parent or completion of relevant counseling or treatment). And, Nicholas provides no authority indicating that a psychosexual evaluation is necessary before the trial court may make a finding of sexual abuse.

Nicholas also argues that psychosexual evaluations are unconstitutional. He cites to In re Marriage of Ricketts, 111 Wn. App. 168, 43 P.3d 1258 (2002) to support his assertion. In Ricketts, the trial court granted a motion for a psychosexual evaluation, which included an order for a father's penile plethysmograph examination. Id. at 170-71. The Ricketts court concluded that the trial court abused its discretion when it ordered the father to submit to a plethysmograph examination, because the record revealed no finding of a compelling interest that outweighed the father's liberty interest. Id. at 173.

Ricketts is distinguishable from this case, because the trial court here explicitly did not order a plethysmograph. Ricketts does not stand for the proposition that psychosexual evaluations are generally unconstitutional. Therefore, Nicholas provides no authority for his assertion that a psychosexual evaluation, without a plethysmograph, is unconstitutional on these facts.

Nicholas also objects to the polygraph requirement of the psychosexual evaluation. He supports this assertion by arguing that polygraphs are not admissible evidence. In so arguing, he cites the unpublished portion of a criminal case that is factually inapposite. State v. Fisher ,184 Wn. App. 766, 338 P.3d 897 (2014), review granted, 183 Wn.2d 1024 (2015). A party may not cite as an authority an unpublished opinion of the Court of Appeals. GR 14.1. Therefore, Nicholas has provided no authority to support his assertion that the trial court erred when it ordered him to take a polygraph in this context.

B. Contact With D.C.

Nicholas argues that the trial court erred when it denied him any contact at all with

D.C.. But, the trial court did not permanently deny Nicholas contact with D.C.. Rather, the trial court stated that before contact could be reestablished Nicholas must undergo a psychosexual evaluation. The court specifically stated that depending upon the results of the psychosexual evaluation, the court would determine if there should be therapeutic reunification counseling. Because of the trial court's finding of sexual abuse, the trial court stated that Nicholas could resume visitation after demonstrating that he is not a risk to D.C. by undergoing

the psychosexual evaluation. We conclude this limitation was reasonably calculated to address the finding of sexual abuse. See RCW 26.09.191(2)(a); RCW 26.09.191(2)(m)(i).

### C. Ordering Additional Relief

Nicholas contends that the trial court erred, because Lisa's original petition to modify the parenting plan did not request the relief the trial court actually awarded in the final parenting plan—that Nicholas' residential time with the child shall be limited or restrained completely and that mutual decision making was no longer required He observes that Lisa did not amend her original petition to modify it to include allegations of sexual abuse. This alleged error is meritless. Nicholas does not make any argument related to this fact. Nor does he provide any relevant authority indicating that the trial court erred when it granted Lisa's relief notwithstanding her failure to amend her original petition. Consequently, we do not review this challenge. See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (declining to consider arguments not supported by reference to the record or citation to authority).

### V. Attorney Fees

Both parties argue that they are entitled to attorney fees on appeal.

Nicholas argues that he is entitled to attorney fees pursuant to RCW 26.09.260(13). That statute states that if the court finds that a motion to modify a parenting plan has been brought in bad faith, the court shall assess the attorney fees and court costs of the nonmoving parent against the moving party. While this court has the inherent jurisdiction to award attorney fees on appeal when a statute

authorizes attorney fees in the trial court, we have no reason to conclude that Lisa's petition to modify was brought in bad faith. See In re Marriage of Clark, 112 Wn. App. 805, 810, 51 P.3d 135 (2002). Nicholas is not entitled to attorney fees on appeal.

Lisa argues that she is entitled to attorney fees pursuant to RAP 18.1 and RCW 4.84.185 for having to defend against a frivolous appeal. No request was made under chapter 26.09 RCW. Under RAP 18.9, we may award a respondent attorney fees when a petitioner files a frivolous appeal. Skinner v. Holgate, 141 Wn. App. 840, 858, 173 P.3d 300 (2007). In determining whether an appeal is frivolous we are guided by the following considerations: (1) a civil appellant has a right to appeal under RAP 2.2; (2) all doubts as to whether the appeal is frivolous should be resolved in favor of the appellant; (3) the record should be considered as a whole; (4) an appeal that is affirmed simply because the arguments are rejected is not frivolous; (5) an appeal is frivolous if there are no debatable issues upon which reasonable minds might differ, and it is so totally devoid of merit that there was no reasonable possibility of reversal. Streater v. White, 26 Wn. App. 430, 434-35, 613 P.2d 187 (1980).

Lisa argues the appeal was frivolous, because Crook's testimony is clearly admissible. Consequently, she argues that in light of D.C.'s disclosures to Crook, any other issues were devoid of merit. But, even if Crook's testimony is clearly admissible, Nicholas was still entitled to challenge whether her testimony constituted substantial evidence to support the trial court's finding of sexual abuse

under RAP 2.2. Consequently, Nicholas' appeal was not frivolous. We deny Lisa's request for attorney fees on appeal.

We affirm.

WE CONCUR: