FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON

2018 APR -9 AM 8: 51

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Marriage of )
)
JUSTIN ALEXANDER MARX, )  No. 75755-5-I
)
Respondent, )  DIVISION ONE
)
and )  UNPUBLISHED OPINION
)
TARA JOHNIE SHELBY, )
)  FILED: April 9, 2018
Appellant. )

TRICKEY, A.C.J. — The trial court divided Justin Marx and Tara Shelby's assets and debts in their dissolution of marriage proceeding. The trial court declined to award Shelby maintenance. Shelby appeals, arguing that the trial court's findings were not supported by substantial evidence, the trial court's property division was not equitable, and the trial court erred when it declined to award her maintenance. Finding no error, we affirm.

## FACTS

In 1995, Shelby and Marx began dating while going to school in New York. In 2001, Shelby moved to Seattle to attend Bastyr University. Marx was enrolled in a joint Juris Doctor (JD) and Master of Business Administration program at American University in Washington, D.C., and transferred to Seattle University School of Law as a visiting JD student. Eventually, Marx and Shelby began living together in Seattle.

In 2002, Shelby received her degree in spirituality, health, and medicine from Bastyr, and began naturopathic medicine and midwifery programs. In 2003, Marx left to study abroad for a semester at City University of Hong Kong. While Shelby was visiting

Marx, they became engaged. In May 2003, Marx graduated from law school but could not secure a legal job.

Marx and Shelby married in 2004. After the wedding, Marx accepted a job with his father doing marketing for Marx Companies, the family business located in New Jersey. Marx worked for Marx Companies remotely and worked toward starting the business on the West Coast.

In 2005, Shelby became seriously ill because of an enlarged spleen. In May 2006, Shelby had her spleen removed.

In 2008, Shelby graduated from Bastyr with degrees in naturopathy and midwifery. Her total student debt was $284,691. After taking her boards, Shelby began working at One Sky Wellness as a receptionist and naturopath. By April 2009, Shelby had opened her own naturopathic practice, Shelby Naturopathy.

In February 2010, Shelby became ill when she and Marx were traveling in Belize. She was diagnosed with aeromonas hydrophila, a bacterial infection. She elected to start taking Remicade, a chemotherapy drug, to treat the infection. She continues to receive Remicade treatment every eight weeks and is unable to work for 24 to 48 hours while recovering from treatment.

In 2011, Shelly began to obtain funding to start a nonprofit integrative health care facility called "Village."[1] Marx and Shelby did not use community resources to fund Village. Although she had an initial financing goal of $1 million, Shelby was only able to raise $365,000 from donors. She opened Village in November 2011.

In February 2012, Village's board voted to shut it down after it was not as

---

[1] 4 Report of Proceedings (RP) (May 23, 2016) at 361-62.

successful as anticipated, and Shelby stopped seeing patients. Shelby spent March 2012 closing Village.

After Village closed, Marx opened bank accounts in his own name. Marx began depositing his paychecks into his personal U.S. Bank account and paying rent and household expenses from it. He consolidated several of his and Shelby's outstanding debts into a single promissory note from Provident Bank.

In July 2012, Shelby reopened Shelby Naturopathy and operated as One Sky Wellness Associates. While building her practice between 2013 and 2014, Shelby hoped to reopen Village as a for-profit corporation. Shelby needed Marx's personal guarantee for the lease she wanted, but Marx refused to agree to it.

Marx and Shelby agreed that she would pursue a scaled-down version of Village, and Shelby found a lease that did not require a personal guarantee. U.S. Bank offered Shelby a loan of $192,000 to fund Village if she could provide $77,000. U.S. Bank eventually denied her loan application. Marx convinced Shelby not to sign the lease. Shelby remained at Shelby Naturopathy.

Marx's role in Marx Companies expanded over the years. In 2015, his reasonable compensation was $135,000 and his sustainable income totaled $270,000.[2] In 2015, Shelby's income was $102,044. Her reasonable compensation was $77,000 and her sustainable income was $120,000.

In February 2015, Marx moved out of the parties' shared home over concerns about Shelby's health and her continued goal of opening Village. In March 2015, Shelby

---

[2] An expert at trial testified that he calculated the parties' "reasonable compensation" by looking to the median compensation of professionals in similar fields. 5 RP (May 23, 2016, PM) at 462-63, 476-77. He described "sustainable income" as "guaranteed payments and personal benefits." 5 RP (May 23, 2016, PM) at 464.

3

told Marx that she was going to continue with her efforts to expand her practice and open Village, had retained legal counsel, and had possibly secured venture capital financing. In April 2015, Marx petitioned for dissolution of the parties' marriage. In August 2015, Shelby paid for a website for Village.

In August 2016, the trial court entered findings of fact and conclusions of law and issued a final divorce order. The parties had approximately $95,000 in liquid assets, out of which they paid $30,000 in federal income taxes at the time of dissolution. The trial court characterized Shelby Naturopathy as community property valued at $219,000. The trial court characterized Marx's 6 percent interest in Marx Companies as separate property valued at $580,000. The trial court awarded Shelby Naturopathy to Shelby and awarded Marx his interest in Marx Companies.

The trial court divided the parties' community debt between them. The trial court declined to award Shelby maintenance. Although the trial court found that Shelby had conducted duplicative discovery and forced both parties to bear increased costs, it ordered Marx to pay $24,000 of Shelby's attorney fees.

Shelby appeals.

ANALYSIS

Substantial Evidence

Shelby argues that several of the trial court's findings of fact were not supported by substantial evidence. Because each of the trial court's challenged findings of fact were supported by substantial evidence, we disagree.

"On appeal, a trial court's findings of fact will be upheld if supported by substantial evidence." In re Marriage of Bernard, 165 Wn.2d 895, 903, 204 P.3d 907 (2009).

4

"Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the declared premise." In re Marriage of Hall, 103 Wn.2d 236, 246, 692 P.2d 175 (1984).

First, Shelby argues that the trial court's finding that Marx's interest in Marx Companies was "'illusory'" is not supported by substantial evidence.[3] Specifically, Shelby claims that Marx's interest is a salable asset that the trial court should have considered in its valuation of his separate property.

The trial court's challenged finding reads, "[Marx's] interest in Marx Companies has a value of $580,000, although practically the value is illusory because all [Marx] receives from the business is an annual income that his father controls."[4]

Here, the trial court's statement that the value of Marx's interest in Marx Companies was "illusory" is supported by substantial evidence. At the time of the dissolution proceeding, Marx held a 6 percent interest in Marx Companies. Marx Companies' operating agreement specifies that Marx Companies is member-managed and cannot take action without a majority vote of its members. Under the operating agreement, if a member wants to sell his or her interest, the other members have a right of first refusal, and "[t]he unanimous consent of all members is required for a member to sell his [or] her share to a non-member or for an assignee of a member's share to become a member."[5]

Marx's 6 percent ownership interest is insufficient to give him a controlling interest in Marx Companies, and thus he cannot direct the company without the consent of the

---

[3] Br. of Appellant at 25.
[4] Clerk's Papers (CP) at 264.
[5] Ex. 324 at 7.

5

other members. Marx cannot sell his interest to a non-member or give an assignee a membership interest in Marx Companies without the consent of the other members, even if the other members decline to exercise their right of first refusal.

Despite Marx's lack of control over this asset, the trial court valued Marx's interest in Marx Companies at $580,000. The trial court's final divorce order awarded Marx his "[m]inority interest in and to Marx Companies, LLC."[6] Thus, the trial court did attach a value to Marx's minority interest in Marx Companies despite its subsequent statement that the value was "practically . . . illusory," and awarded him that interest as a salable separate property asset.[7] Therefore, we conclude that the trial court's finding that Marx's ownership interest in Marx Companies was illusory was supported by substantial evidence and reject Shelby's challenge.[8]

Second, Shelby argues that the trial court's findings regarding her plan to open Village in the future were not supported by substantial evidence.

The trial court's challenged findings state, "[Shelby] has the potential to make much more than just from her work as a naturopath" and "[Shelby] has already started [her plan to open another medical clinic] by renting out her office space to another provider, who pays her rent."[9]

---

[6] CP at 273.

[7] CP at 264.

[8] Shelby also argues that the percentage of Marx's interest in Marx Companies is material to the trial court's valuation. At trial, the parties discussed whether an amendment reducing Marx's interest in Marx Companies from 15 percent to 6 percent to be consistent with federal tax returns constituted waste. The trial court determined that the amendment was "motivated by legitimate business goals, was a reasonable action, and did not constitute waste." CP at 264. Shelby has not challenged the trial court's finding that this reduction in Marx's ownership interest did not constitute waste, and instead raises the novel argument that the specific percentage was relevant to the trial court's valuation of the asset. We decline to reach her argument. RAP 10(a)(4), (6).

[9] CP at 269.

6

Here, substantial evidence supports the trial court's findings. Shelby testified that her anticipated annual income after opening Village would be $250,000 a year. This would include a salary of $150,000, which alone would exceed her current income of at least $120,000, and additional practice revenue. Thus, if Village opens in the future, Shelby would increase her income significantly.

Further, in May 2015, Shelby rented her office space to a new provider. She began reporting rental income from the provider in October 2015. Shelby's decision to rent her office space is likely not due to a lack of patients, as she remains in high demand and has a waiting list. In addition, Shelby has developed contacts that could help with opening Village, such as administrators at Swedish Medical Center. She has also discussed the possibility of opening a medical clinic with Dr. Leanna Standish. Shelby paid legal fees to an attorney at Ryan Swanson law firm in March 2015, and paid for a website for Village in August 2015. These actions further indicate Shelby's intent to open Village or a similar institution in the future. Therefore, the record demonstrates that Shelby has taken several affirmative steps toward opening another medical clinic, including renting out her office space.

Thus, we conclude that substantial evidence in the record supports the trial court's findings that Shelby has the potential to make much more if Village opens in the future and that she has taken steps toward realizing that goal.

Shelby also contends that the record does not show that her plan to open another clinic was viable, and thus the trial court's findings regarding her plan to open Village are not supported by substantial evidence. Specifically, she argues that she had previously been unable to secure the loans necessary to open Village and that Marx had believed

that Village was not going to be successful.

But the trial court's findings are not necessarily dependent on the success of Shelby's plan to open another clinic. Rather, the trial court stated that Shelby "has the potential" to increase her income significantly.

Further, Shelby testified that she had a venture capitalist friend who believed in her Village concept. This source of additional financing could alleviate Shelby's concerns about being able to secure loans or pay the start-up expenses of Village. Therefore, because the trial court's findings are not dependent on Village's success and Shelby's testimony indicates that her concerns over financing may have been addressed, we reject her argument.

Shelby also notes that Marx had believed that Village would not be successful. Shelby has not demonstrated how Marx's past concerns regarding the nonprofit Village are relevant to her current plans to start a new, for-profit corporation. We reject Shelby's argument.

Third, Shelby argues that the trial court's finding that she could work 60 to 80 hours per week was not supported by substantial evidence. She contends that medical testimony at trial demonstrated that her health cannot support such a demanding work schedule.

The trial court's challenged finding states, "By [Shelby's] own testimony, when she started her not for profit, Village, she worked 60-80 hours per week."[10]

Here, Shelby's argument misinterprets the trial court's finding. The trial court did not find that Shelby was still capable of working 60 to 80 hours per week. Rather, the trial

---

[10] CP at 269.

court found that Shelby worked 60 to 80 hours per week when she started the nonprofit Village, and that "[s]he had the ability to do that" at that time.[11] Shelby testified that she worked between 60 to 70 hours per week from the summer of 2011 to January 2012.[12] Thus, the trial court's finding accurately reflected testimony concerning Shelby's past ability to work over 60 hours per week, and did not state that Shelby was still able to maintain such a demanding schedule. We conclude that the trial court's challenged finding was supported by substantial evidence in the record.[13]

### Property Division

Shelby argues that the trial court abused its discretion when its property division left her with liabilities exceeding her assets while Marx was awarded assets exceeding his liabilities. Because the trial court properly considered relevant required factors and made an equitable division of the parties' assets and liabilities, we disagree.

In a dissolution proceeding, the trial court, without regard to misconduct, makes an equitable distribution of the parties' liabilities and property after considering: "(1) [t]he nature and extent of the community property; (2) [t]he nature and extent of the separate property; (3) [t]he duration of the marriage . . .; and (4) [t]he economic circumstances of each spouse . . . at the time the division of property is to become effective," along with any other relevant factors. RCW 26.09.080. Other relevant factors include "the health

---

[11] CP at 268.

[12] 8 RP (May 25, 2016) at 947.

[13] Shelby argues that a future hospitalization could impact her ability to work full time in the future, citing medical testimony that she should not work full time due to her unstable health. But in her briefing to this court and at oral argument, Shelby stated that she is not claiming that her health issues prevent her from working full time. Further, evidence in the record established that Shelby was working full time at the time of trial, she had not had an appointment with Dr. Standish, one of her treating physicians, since February 2014, and she scheduled her Remicade treatments to avoid impacts on her ability to work a normal work week. We reject any challenge Shelby raises against the trial court's findings regarding her ability to work full time.

9

and ages of the parties, their prospects for future earnings, their education and employment histories, their necessities and financial abilities, their foreseeable future acquisitions and obligations, and whether the property to be divided should be attributed to the inheritance or effects of one or both spouses." In re Marriage of Olivares, 69 Wn. App. 324, 329, 848 P.2d 1281 (1993).

To be fair and equitable, the trial court's division of property and liabilities requires "'fairness, based upon a consideration of all the circumstances of the marriage, both past and present, and an evaluation of the future needs of the parties.'" In re Marriage of Zahm, 138 Wn.2d 213, 218-19, 978 P.2d 498 (1999) (quoting In re Marriage of Crosetto, 82 Wn. App. 545, 556, 918 P.2d 954 (1996)). The division of property and liabilities does not need to be equal to be valid. In re Marriage of White, 105 Wn. App. 545, 549, 20 P.3d 481 (2001).

"[T]he trial court has broad discretion in distributing the marital property, and its decision will be reversed only if there is a manifest abuse of discretion." In re Marriage of Rockwell, 141 Wn. App. 235, 242-43, 170 P.3d 572 (2007). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997). The reviewing court "does not review the trial court's credibility determinations or weigh conflicting evidence." In re Marriage of Rostrom, 184 Wn. App. 744, 750, 339 P.3d 185 (2014).

Here, the trial court considered the relevant RCW 26.09.080 factors. First, the trial court listed and described the parties' community and separate personal property. The trial court also set out the community debt and separate debt liabilities of Shelby and

Marx. The trial court noted that the parties began a committed relationship in May 2003 and were married on March 25, 2004, and that the marital community ended on April 10, 2015. The trial court noted that both parties were 38 years old and held professional degrees. The trial court found that Shelby made at least $120,000 per year since the parties' separation and that Marx made $257,000 per year.

In addition, the trial court considered several equitable factors. The trial court acknowledged that Marx moved to Seattle from Washington, D.C. to be with Shelby, and worked for his father after giving up his goal of being a lawyer so that Shelby could attend her chosen school. The trial court noted that the parties incurred substantial debt to fund Shelby's education and career. The trial court noted that Marx Companies was a family-oriented, closely-held business, and that Marx did not hold a controlling interest. The trial court highlighted that Shelby's naturopathic practice was acquired during the marriage and was awarded entirely to her, along with more than 100 percent of the parties' community property.

After weighing the RCW 26.09.080 factors and equitable considerations, the trial court elected not to divide the parties' assets and debt equally. The trial court awarded Shelby assets totaling $303,732, including Shelby Naturopathy's value of $219,000. The trial court awarded Marx $605,526 in assets, including his 6 percent interest in Marx Companies' value of $580,000. Shelby was awarded liabilities totaling $310,046 and Marx was awarded liabilities totaling $175,491. But the trial court also ordered Marx to pay $116,280 of Shelby's student debt over 60 months, which left Shelby with $193,766

in total liabilities and Marx with $291,771 in total liabilities.[14] Thus, Shelby's total award was $109,966 and Marx's total award was $313,755.

The trial court properly considered the RCW 26.09.080 factors and other relevant equitable concerns when fashioning its property division. Although the trial court's division of the parties' liabilities and assets is not equal, it is equitable in light of the parties' respective circumstances. Shelby was awarded over 100 percent of the parties' community property.[15] She was also awarded 100 percent interest in her naturopathic practice, although the practice was obtained during the marriage.

Marx's property award primarily consists of his 6 percent interest in Marx Companies. Although the trial court's statement that this interest is illusory was supported by substantial evidence, it still assigned substantial value to it. But this interest does not guarantee him a salary and is not readily salable.

Similarly, the trial court equitably divided the parties' liabilities to address any imbalance in their asset awards. The parties incurred substantial debt before and during their marriage, most notably from Shelby's student loans. At the time of separation, the balance of Shelby's student loans that were community debt totaled $119,354. The trial court ordered Marx to pay the majority of this community debt, totaling $116,280 over five

---

[14] The parties dispute whether this payment is properly characterized as a maintenance payment or a property division award. This award, although payable over time, appears in the trial court's conclusions regarding the parties' community debt. Further, the trial court explicitly declined to award Shelby maintenance, and in doing so did not reference this payment of student loans. We conclude that this payment is properly considered as part of the trial court's property award.

[15] Shelby argues that this award constituted "predistributions that no longer exist" because they were used to pay attorney fees and expert witness fees, and thus should not be considered. Br. of Appellant at 19. Shelby does not support this argument with legal authority, and appears to abandon the argument in her reply brief. We reject this argument.

years, although going forward he will not derive any benefit from Shelby Naturopathy or Shelby's work as a naturopath.

In sum, the trial court considered the nature of the parties' respective interests in Shelby Naturopathy and Marx Companies and their future earning potential when fashioning its asset division. The trial court's division of liabilities demonstrates consideration of the nature of the parties' debts and circumstances. We conclude that the trial court's division of the parties' assets and liabilities was not an abuse of discretion.[16]

<u>Maintenance</u>

Shelby argues that the trial court abused its discretion when it declined to award her maintenance to offset its disproportionate property distribution. Because the trial court properly considered the relevant factors when it declined to award Shelby maintenance, we disagree.

In a dissolution proceeding, the trial court may grant an order of maintenance and determine the length and amount after considering factors including, but not limited to:

(a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;
(b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;
(c) The standard of living established during the marriage or domestic partnership;

---

[16] Shelby argues that the trial court impermissibly weighed the fact that most of the property at issue was Marx's separate property more heavily than other factors. Shelby contends that "the character of the property seems to have controlled the [trial] court's [decision]." Br. of Appellant at 30. But Shelby has not offered citation to the record or substantive argument in support of her contention that the trial court impermissibly weighed the nature of Marx's separate property more heavily than other relevant factors. We reject this argument. RAP 10.3(a)(6).

(d) The duration of the marriage or domestic partnership;

(e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and

(f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

RCW 26.09.090. "Under this provision, the only limitation placed upon the trial court's ability to award maintenance is that the amount and duration, considering all relevant factors, be just." In re Marriage of Washburn, 101 Wn.2d 168, 178, 677 P.2d 152 (1984).

"The trial court may properly consider the property division when determining maintenance, and may consider maintenance in making an equitable division of the property." In re Marriage of Estes, 84 Wn. App. 586, 593, 929 P.2d 500 (1997). The trial court may look to the parties' standard of living during the marriage and the resources and obligations of the spouse seeking maintenance when deciding whether to award maintenance. Estes, 84 Wn. App. at 593; see also In re Marriage of Williams, 84 Wn. App. 263, 268, 927 P.2d 679 (1996) ("The court's paramount concern is the economic condition in which the dissolution decree leaves the parties.").

"The purpose of spousal maintenance is to support a spouse . . . until [he or she] is able to earn [his or her] own living or otherwise become self-supporting." In re Marriage of Irwin, 64 Wn. App. 38, 55, 822 P.2d 797 (1992). But "a demonstrated capacity of self-support does not automatically preclude an award of maintenance." Washburn, 101 Wn.2d at 178.

A trial court's decision regarding maintenance will only be overturned on appeal for manifest abuse of discretion. Washburn, 101 Wn.2d at 179.

Here, the trial court considered each of the relevant RCW 26.09.090 factors when deciding whether to award maintenance. Shelby has not challenged the majority of these

14

findings. Those that she has challenged are supported by substantial evidence, as discussed above.

The trial court found that Shelby earned at least $120,000 per year, and had taken steps toward increasing her income to $250,000 per year. The trial court found that Shelby did not need further education to be self-supporting because she already held a naturopathic doctor degree, a degree in midwifery, and an additional postgraduate certificate.

The trial court found that the parties maintained their lifestyle during the marriage by incurring debt, and stated that "[a] lifestyle based on debt is not a true standard of living."[17] It also found that Shelby had received a temporary order of maintenance for $4,500 per month postseparation, but did not change her spending habits and continued to incur debt.

The trial court stated the pertinent dates of the parties' marriage, and did not make further findings indicating that the duration of the marriage warranted maintenance. The trial court found that both spouses were 38 years old. The trial court found that "[t]he evidence at trial showed that [Shelby's] chronic illnesses are in remission and that she takes various medications to stay in remission."[18] The trial court found that Shelby was capable of working full time or more than full time in the future.

Based on these findings, the trial court concluded that the parties' use of debt to support their lifestyle was not a standard of living and that Shelby was capable of self-support. Thus, the trial court properly considered each of the relevant statutory factors, noted that the parties' lifestyle was based on debt, and concluded that Shelby was already

---

[17] CP at 268.
[18] CP at 269.

15

self-sufficient. When combined with the trial court's equitable division of the parties' liabilities and assets, we conclude that the trial court did not abuse its discretion when it denied Shelby's request for maintenance.

Shelby argues that Marx's claimed expenses are too high because of the financial support he receives from Marx Companies. She also argues that evidence in the record demonstrates that she has high food, medical, and housing costs. "This court does not review the trial court's credibility determinations or weigh conflicting evidence." Rostrom, 184 Wn. App. at 750. Shelby's citations to the record regarding the parties' claimed expenses ask this court to review the trial court's weighing of the evidence. We decline to do so.

In sum, Shelby's arguments that the trial court abused its discretion because its failure to award maintenance exacerbates an unequal property division are unpersuasive. The trial court equitably divided the parties' property and liabilities. Shelby has not demonstrated that the trial court failed to consider the relevant statutory factors when determining whether to award maintenance. Therefore, we conclude that the trial court did not abuse its discretion when it denied Shelby's request for maintenance.

Patent Disparity

Shelby argues that the trial court's property division and denial of her maintenance request results in a patent disparity in the parties' economic circumstances. She argues that the trial court's property division leaves her with only 26 percent of the parties' assets while Marx was awarded 74 percent, compares each party's income after taxes and expenses, and highlights the support Marx receives from Marx Companies for living

expenses. Because the trial court's property division and denial of maintenance did not result in a patent disparity between the parties' economic circumstances, we disagree.

"If the decree results in a patent disparity in the parties' economic circumstances, a manifest abuse of discretion has occurred." Rockwell, 141 Wn. App. at 243 (citing In re Marriage of Pea, 17 Wn. App. 728, 731, 566 P.2d 212 (1977)).

Here, as discussed above, Shelby was awarded the entirety of her naturopathic practice, from which she derives personal and rental income, although it was obtained during the marriage. Although Marx's interest in Marx Companies has a higher value than Shelby Naturopathy, the trial court properly determined that his interest is illusory because it is not readily salable and does not guarantee him an income. Further, the trial court used its division of the parties' liabilities to alleviate any imbalance in the asset award. Thus, the trial court's property division did not result in a patent disparity in the parties' economic circumstances.

Similarly, the trial court's decision not to award Shelby maintenance did not result in a patent disparity between the parties' economic circumstances. Shelby has not challenged the trial court's determination that she is self-sufficient without maintenance. The trial court considered Shelby's separate student debt when making its property division, and ordered Marx to pay the majority of Shelby's student loans that constituted community debt along with other substantial community liabilities. Further, the trial court found that that the parties' lifestyle during the marriage was financed by debt, and thus did not constitute a standard of living. Although Shelby received temporary maintenance of $4,500 per month following the parties' separation, she continued to incur debt and did not change her spending habits. Shelby's complaints that her debt burden will leave her

unable to continue her lifestyle ignore the trial court's unchallenged findings regarding her spending habits and use of debt.

In sum, the trial court's property division and its decision not to award Shelby maintenance did not result in a patent disparity between the parties' economic circumstances. We conclude that the trial court did not manifestly abuse its discretion and reject Shelby's argument.

### Fees on Appeal

Shelby requests her attorney fees on appeal. Marx opposes Shelby's request and argues that this court should award him fees for having to answer a frivolous appeal.

An appellate court may award a party his or her reasonable attorney fees on appeal based on that party's need and the other's ability to pay. RCW 26.09.140; In re Marriage of Leslie, 90 Wn. App. 796, 807, 954 P.2d 330 (1998). An appellate court may also order a party to pay the other party terms or compensatory damages for filing a frivolous appeal, i.e., "one which, when all doubts are resolved in favor of the appellant, is so devoid of merit that there is no chance of reversal." Fidelity Mort. Corp. v. Seattle Times Co., 131 Wn. App. 462, 473, 128 P.3d 621 (2005) (citing RAP 18.9(a)).

Here, as discussed above, the trial court's property division was equitable and it correctly denied Shelby's request for maintenance in part because she is self-sufficient. Marx is already obligated to pay a significant portion of the parties' community debt over the next five years and was ordered to pay $24,000 of Shelby's attorney fees below. We conclude that Shelby has not demonstrated need or that Marx has an ability to pay, and decline to award Shelby her attorney fees on appeal.

We also reject Marx's argument that Shelby's appeal is frivolous. Shelby has

raised debatable issues on appeal, and Marx's allegations that Shelby has extensively misrepresented the record and the trial court's conclusions are overstated. We decline to award Marx fees under RAP 18.9.[19]

Affirmed.

Trickey, A.C.

WE CONCUR:

Dwyer, J.

Cox, J.

---

[19] Shelby filed a financial declaration in support of her request for fees, and Marx filed a declaration and an amended declaration in opposition. Shelby moved to strike Marx's declarations as untimely under RAP 18.1(c). In an action where the financial resources of one or more parties are considered for an award of attorney fees and expenses, "each party must serve upon the other and file a financial affidavit no later than 10 days prior to the date the case is set for oral argument or consideration on the merits." RAP 18.1(c). Oral argument for the present case was heard on November 3, 2017. Marx filed a declaration and an amended declaration in opposition to Shelby's financial declaration on November 3. Both of Marx's responsive declarations are untimely under RAP 18.1(c). We therefore grant Shelby's motion to strike both.