# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 71860-6-I |
| | ) | |
| KATHRYN SUE ROSTROM, | ) | |
| | ) | DIVISION ONE |
| Respondent, | ) | |
| | ) | |
| and | ) | PUBLISHED OPINION |
| | ) | |
| DALE LEE ROSTROM, | ) | |
| | ) | Filed: December 1, 2014 |
| Appellant. | ) | |
| | ) | |

LEACH, J. — Dale Rostrom appeals a trial court decision that allowed Kathryn Rostrom to move their minor children from the United States to Australia. Dale[1] challenges a number of the court's findings of fact. He also claims that the court did not order adequate safeguards for enforcement of the parenting plan after the children moved. The trial court considered the factors required by the relocation statute, and substantial evidence supports the court's findings. But the court's parenting plan does not include significant stipulations made by the parties about the trial court's continuing jurisdiction to modify and enforce its orders. We remand to the trial court with directions to amend the parenting plan to incorporate these stipulations, to consider if it should require a bond to guarantee compliance with any parenting plan provisions, and to require the

---

[1] For clarity, we refer to the parties by their first names.

parties to register the amended parenting plan in the Australian Family Law Court. We otherwise affirm.

## FACTS

Dale Rostrom and Kathryn Rostrom married in 1996 and have a son and daughter, who were 6 and 11 years old at the time of trial. Kathryn worked as a high level executive for technology companies. Dale worked as an automotive technician and, after returning to school, in the field of computer-assisted drafting. While on a business trip to Shanghai, China, in October 2012, Kathryn met John Foster, a resident of Australia. The following month, Kathryn visited Foster in Australia, and the two became romantically involved. When she returned, Kathryn asked Dale to move out of the family home, which he did on November 11, 2012.

Later that month, Kathryn filed a petition to dissolve the marriage. After the separation, tensions within the family and especially between Dale and K.R., the couple's daughter, became more pronounced. On August 18, 2013, Dale was arrested for driving under the influence (DUI). The trial court suspended the children's overnight visits with him for six months.

The parties settled all issues at mediation on September 24, 2013, signing a CR 2A agreement and an agreed parenting plan. In October 2013, Kathryn

visited Foster in Australia, and they became engaged to be married. In November, Kathryn discovered she was pregnant with Foster's child.

On November 25, 2013, Kathryn filed a notice of intended relocation to Australia. On December 10, 2013, Dale filed an objection.

On December 24, 2013, the court denied Dale's motion to invalidate the CR 2A agreement, noting in its order, "Entry of final orders at this time does not affect resolution of the issue of relocation now pending, which will be resolved on its own merits." On December 30, 2013, the trial court entered final orders for support, findings of fact and conclusions of law, a parenting plan, and a dissolution decree. The parenting plan designated Kathryn the primary residential parent and granted Dale visitation subject to certain restrictions based on "[a] long-term impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting functions."

In April 2014, the same trial judge presided over a four-day bench trial on relocation. On May 2, 2014, the court entered a new parenting plan and an order allowing relocation. On May 4, 2014, Kathryn moved with the children to Australia. On May 28, 2014, a commissioner of this court denied Dale's emergency motion for a stay pending appeal.

Dale appeals.

NO. 71860-6-I / 4

## STANDARD OF REVIEW

The United States Constitution protects parental rights as a fundamental liberty interest.[2] We review a trial court's relocation decision for abuse of discretion.[3] A court abuses its discretion when it makes a manifestly unreasonable decision or bases its decision upon untenable grounds or reasons.[4] This can occur when a court applies an incorrect legal standard, substantial evidence does not support the court's findings, or the findings do not meet the requirements of the correct standard.[5]

This court does not review the trial court's credibility determinations or weigh conflicting evidence.[6] Given the strong interest in the finality of marriage dissolution proceedings, we defer to the trial court and will affirm "unless no reasonable judge would have reached the same conclusion."[7]

---

[2] Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

[3] In re Marriage of Kim, 179 Wn. App. 232, 240, 317 P.3d 555 (citing In re Marriage of Horner, 151 Wn.2d 884, 893, 93 P.3d 124 (2004); Bay v. Jensen, 147 Wn. App. 641, 651, 196 P.3d 753 (2008)), review denied, 180 Wn.2d 1012 (2014).

[4] State v. Sisouvanh, 175 Wn.2d 607, 623, 290 P.3d 942 (2012).

[5] Kim, 179 Wn. App. at 240 (citing Horner, 151 Wn.2d at 894).

[6] In re Marriage of Rich, 80 Wn. App. 252, 259, 907 P.2d 1234 (1996).

[7] Kim, 179 Wn. App. at 240 (citing In re Marriage of Landry, 103 Wn.2d 807, 809-10, 699 P.2d 214 (1985)).

-4-

## ANALYSIS

### The UCCJEA, the CRA, and the Hague Convention

Dale claims that the court's current orders do not allow "the Washington trial court to guarantee the Relocation Order or Parenting Plan are currently enforceable" in Australia. He contends that the court abused its discretion by permitting relocation "without assuring the Washington courts' continuing jurisdiction." Because the court "did not fully understand the Convention or Australian Law," Dale argues, the court jeopardized his visitation rights and the possibility of the children's return.

Under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), chapter 26.27 RCW, a court making a valid initial custody determination retains exclusive, continuing jurisdiction until

> (a) A court of this state determines that neither the child, the child's parents, and any person acting as a parent do not have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child's care, protection, training, and personal relationships; or
> (b) A court of this state or a court of another state determines that the child, the child's parents, and any person acting as a parent do not presently reside in this state.[8]

For purposes of the UCCJEA, Washington courts treat a foreign country the same as a state of the United States.[9]

---

[8] RCW 26.27.211(1)(a)-(b).
[9] RCW 26.27.051.

NO. 71860-6-I / 6

Both the United States and Australia signed the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention).[10] The goals of the Hague Convention are to "secure the prompt return of children wrongfully removed to or retained in any Contracting State" as well as "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."[11]

In child relocation matters, Washington State courts have wide discretion to decide where and with which parent a child will reside.[12] The determination "is inherently a subjective one."[13] However, the child relocation act (CRA), RCW 26.09.405-.560, provides guidance to courts.[14] The CRA directs consideration of the best interests of both the child and the relocating person.[15] It creates a rebuttable presumption permitting relocation based on the idea "that a fit parent will act in the best interests of her child."[16] The party objecting to the relocation has the burden of demonstrating, by a preponderance of the evidence,[17] that "the 'detrimental effect of the relocation outweighs the benefit of the change to the

---

[10] Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 49, codified at 42 U.S.C. §§ 11601-11610.
[11] Hague Convention, art. 1; 42 U.S.C. § 11601.
[12] See In re Marriage of Grigsby, 112 Wn. App. 1, 6, 57 P.3d 1166 (2002).
[13] Grigsby, 112 Wn. App. at 14.
[14] RCW 26.09.405-.560.
[15] Horner, 151 Wn.2d at 886-87 (citing RCW 26.09.520).
[16] Horner, 151 Wn.2d at 895.
[17] Kim, 179 Wn. App. at 241 (citing Horner, 151 Wn.2d at 895-97).

child and the relocating person.'"[18] When deciding if the objecting party has met this burden, the court must consider each of the relevant child relocation factors enumerated in RCW 26.09.520, which "are equally important because they are neither weighted nor listed in any particular order."[19] The factors are

(1)     The relative strength, nature, quality, extent of involvement and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life;

(2)     Prior agreements of the parties;

(3)     Whether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to relocation;

(4)     Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191;

(5)     The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation;

(6)     The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;

(7)     The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations;

(8)     The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent;

(9)     The alternatives to relocation and whether it is feasible and desirable for  the other party to relocate also;

(10)    The financial impact and logistics of the relocation or its prevention; and

---

[18] Horner, 151 Wn.2d at 895 (quoting RCW 26.09.520).
[19] Horner, 151 Wn.2d at 894.

(11)   For a temporary order, the amount of time before a final decision can be made at trial.[20]

Findings and Conclusions under RCW 26.09.520

The trial court found that Dale failed to rebut the presumption that the benefits of relocation outweighed any detrimental effects and permitted Kathryn to move with the children to Australia.   The court explicitly considered the 10 applicable statutory factors listed in RCW 26.09.520 and entered corresponding findings of fact.   Dale makes 25 assignments of error, challenging 6 of the court's 10 findings on the relocation factors.   He also assigns error to the court's conclusion that "a residential plan can be made that allows [him] to maintain a close bond with his children despite their relocation with [Kathryn] to Australia" and makes several other challenges.

Finding of fact 2.3.1, regarding the relative strength, nature, quality, extent of involvement, and stability of the children's relationship with each parent, siblings, and other significant persons in the child's life:

Dale challenges the court's finding that "the children's relationship is more stable with and dependent upon [Kathryn] than with [Dale]." He also disputes the court's finding that Janet Tatum, the children's counselor, "confirms challenges [Dale] has with the daughter and his overall parenting skills." And though the court found that the children's relationships with extended family "can and should be maintained," Dale claims that the trial court did not adequately address RCW

---

[20] RCW 26.09.520.

26.09.520(1) because the court "discussed no mechanism for maintaining the relationship given the distance to Australia and travel logistics," made "no finding that [Kathryn's] new partner has any significant relationship with the children," and disregarded the fact that "[o]ther than [Kathryn], all significant persons in the children's lives are in Washington."

The record supports the trial court's findings on the relative strength of the children's relationships with Dale and Kathryn. The court heard testimony from Dale and Kathryn as well as a number of other family members, including Kathryn's mother, sister, and brothers. Although Dale's girl friend testified about the loving relationship Dale has with the children, she also described tensions and a change in K.R.'s behavior since the relocation process began. She noted that K.R. has been "acting up," is sometimes moody, and that "there's a strain" in her relationship with Dale.

Janet Tatum, the children's counselor, also described the "strained" relationship between Dale and K.R. Parenting evaluator Wendy Hutchins-Cook expressed a "concern about providing [parent coaching] recommendations to get this on a better track with Dad and daughter." Hutchins-Cook ultimately recommended that the children have "limited time" with Dale because of his alcohol problems and no overnight visits until he had had six months of clean urinalysis tests. The court found that "[Dale's] love of the children and theirs for

him is not questioned, but he is not as able as [Kathryn] to appropriately communicate, nurture, and manage the children's developmental needs."

The court also considered the strength of the children's relationships with extended family and other significant persons. Kathryn's brother opposed the relocation but conceded that he sees the children only a few times a year at most and rarely communicates with his sister. Dale's brother also opposed the move but acknowledged on cross-examination that he sees the children "on average one to two times a year." Kathryn's mother, Diane Roberts, who had specified visitation under the prerelocation parenting plan, testified about the bond between the children and their parents as well as her own bond with the children. She supported the relocation. Lucinda Frank, Kathryn's sister, who worked as the children's nanny at various times between 2009 and 2012, testified similarly.

Substantial evidence supports the court's findings about Dale's challenges with K.R. and his overall parenting skills and the court's finding that the children's relationship is more stable with and dependent upon Kathryn than Dale. Substantial evidence also shows that the court considered the children's relationships with other significant persons.

Finding of fact 2.3.3, as to whether disrupting contact between the children and Dale would be more detrimental than disrupting contact between the children and Kathryn:

Dale disputes the trial court's finding that Kathryn was "better able to manage and nurture the children, and to foster a continuing and positive relationship between [Dale] and the children." Tatum testified that K.R. expressed mixed feelings toward Dale, which was not unusual under the circumstances, and that K.R. stated during counseling sessions that she and her brother "want[ed] to go" to Australia. At one point, K.R. told her father, "I'm afraid of you. I'd like a life in Australia." Diane Roberts testified that K.R. "wants to be with her mom," and a neighbor testified that K.R. was "really excited" about the move. In its findings, the court noted the bond that the children have with both parents and acknowledged the time that Dale took off from work to care for the children when they were younger but ultimately concluded that currently the children were more dependent on Kathryn than Dale.

Dale relies on In re Marriage of Grigsby[21] to support his claim that the detrimental effects of relocation outweigh the benefits. This reliance is misplaced. In Grigsby, this court upheld the denial of a relocation order, in part because the children had never been to Dallas and had "minimal contact" with the mother's fiancé.[22] Moreover, the Grigsby children had daily contact with their

_____

[21] 112 Wn. App. 1, 57 P.3d 1166 (2002).
[22] Grigsby, 112 Wn. App. at 10.

-11-

paternal grandparents, who opposed relocation.[23]   By contrast, the Rostrom

children have been to Australia and spent time with Foster both there and in

Washington.  Extended family members with whom the children have the most

significant relationships support the relocation.   Substantial evidence supports

the court's findings.

<u>Finding of fact 2.3.4a, regarding limitations to which Dale is subject under RCW
26.09.191</u>:

Dale disputes the trial court finding that "[he] minimizes his vulnerability to

alcohol and personal responsibility for his recent DUI charge.  This jeopardizes

both his relationship with and the safety of the children.   Accordingly, the

parenting plan shall contain some controls on [Dale's] use of alcohol."  Dale

contends that the court applied an incorrect standard of a "history of alcohol use"

rather than a "long-term impairment" and violated his due process rights "when it

sua sponte imposed a restriction" on his alcohol use which neither party

requested.

RCW 26.09.191 grants the court broad discretion to impose restrictions on

a parent when his or her "involvement or conduct may have an adverse effect on

the child's best interests."[24]   The court may preclude or limit parenting plan

provisions if "[a] long-term impairment resulting from drug, alcohol, or other

---

[23] <u>Grigsby</u>, 112 Wn. App. at 10.
[24] RCW 26.09.191(3).

substance abuse . . . interferes with the performance of parenting functions."[25] Due process requires that the court provide notice of the issue to be argued but does not require the court to provide notice of a restriction to be imposed.[26]

The court heard testimony about Dale's drinking from Kathryn, her sister Lucinda Frank, and several drug and alcohol specialists. Kathryn and her sister described Dale drinking heavily, especially on weekends. A drug and alcohol evaluator diagnosed Dale with "Axis I alcohol dependence" with an initial recommendation of a four-month relapse prevention program. Shortly after his treatment exit interview in August 2013, police arrested Dale for DUI after he hit several parked cars and registered .14 on a breath test. After this arrest and Dale's self-report of seven beers at last use, the treatment recommendation for Dale increased to one year. An addiction psychologist testified for Dale that until the DUI in 2013, there was no real data that would support a substance abuse disorder and that Dale had "a lot of recovery capital" in his favor. This psychologist diagnosed Dale with a "DSMV alcohol use disorder of moderate, in

---

[25] RCW 26.09.191(3)(c); see also RCW 26.09.004(2)(a)-(f). "'Parenting functions' means those aspects of the parent-child relationship in which the parent makes decisions and performs functions necessary for the care and growth of the child." RCW 26.09.004(2).

[26] See In re Marriage of Pennamen, 135 Wn. App. 790, 807, 146 P.3d 466 (2006) (no due process violation where parent had notice that court would consider basis of parenting plan restrictions).

early remission." Parenting evaluator Hutchins-Cook recommended that Dale have "limited time" with the children because of his alcohol use.

Substantial evidence supports the court's finding that Dale minimized his vulnerability to alcohol and his personal responsibility. At trial, he acknowledged drinking but denied ever drinking to the point of impairment. When asked if he had an alcohol abuse problem, he answered that he did not have "the educational level or the training" to make that assessment. Although he cannot drive without an ignition lock and attends one or two Alcoholics Anonymous meetings each week, Dale testified that before the separation, "there was never a [drinking] problem stated." When asked if he ever drank too much, he responded, "Not that I'm aware of." When he answered other questions on the topic, he tended to focus on technicalities, such as the meaning of "impaired" or the methodology of determining blood alcohol content.

The trial court's imposition of restrictions on Dale's alcohol use did not violate his right to due process. The parties disputed the effect of Dale's alcohol use on parenting plan decisions throughout the case, and Dale agreed to restrictions in the December 2013 parenting plan. The May 2014 parenting plan did not impose new restrictions without notice. The court heard testimony from expert and lay witnesses, and Dale had the opportunity to testify and to cross-

examine Kathryn's witnesses on this issue. Substantial evidence supports the court's findings, and those findings support its decision.

Finding of fact 2.3.5, regarding the reasons and good faith of each person seeking or opposing the relocation:

Because Foster testified that he planned to marry Kathryn whether or not she moved to Australia, Dale challenges the trial court finding that Kathryn would be a single mother if she remained in Washington. We disagree with Dale. Substantial evidence supports the trial court finding that Foster would not move to the United States. Consequently, the court properly found that even if the couple married, Kathryn would not have her husband's regular presence or support in raising their child and Dale and Kathryn's two children if she remained in Washington.

Dale also contends that the trial court failed to separate Kathryn's relocation considerations from those of the children. RCW 26.09.530 prohibits the court from "admit[ting] evidence on the issue of whether the person seeking to relocate the child will forego his or her own relocation if the child's relocation is not permitted." Dale points to Kathryn's statement that "if I'm denied living in Australia, I could go live with my mom with the children." However, Kathryn gave this hypothetical answer in response to opposing counsel's repeated questions about her alternatives. She did not claim that she would forgo relocation if the

court prohibited the children from moving. Dale does not show that the trial court improperly admitted evidence on this issue.

Finding of fact 2.3.6, regarding the age, developmental stage, and needs of the children, and the likely impact the relocation would have on their physical, educational, and emotional development, taking into consideration any special needs of the children:

Dale also disputes the court's finding that "[t]he younger child, while perhaps at a more malleable age, also is dependent on [Kathryn] to provide the secure and stable routine he knows." A significant amount of trial testimony focused on Dale's relationship with K.R., with less testimony describing Dale's relationship with his son. But Dale did not propose separating the children, and the court appropriately considered the siblings' relationship when deciding the residential provisions for the children.[27] Substantial evidence supports the court's findings about the needs of both children.

Finding of fact 2.3.8, regarding the availability of alternative arrangements to foster and continue the children's relationship with and access to Dale; Finding of fact 2.6.1, as to whether a residential plan can be made that allows Dale to maintain a close bond with his children despite their relocation:

Dale argues that "[w]ith the children in Australia, a residential plan cannot be made allowing [him] to maintain a close bond with them." But the parenting plan provides for at least twice-weekly contact between Dale and the children via Skype. The plan permits Dale to buy K.R. a cell phone to use "at will" to contact

---

[27] RCW 26.09.187(3)(a)(v).

him and to buy his son a phone when he turns age 10. It provides Dale access to the children's school and medical records "to the extent possible." The plan specifically provides for Dale's visits with the children in Washington and Australia, with travel costs "borne proportionally to income to reduce the burden on [Dale]." As the court recognized, "It is inherently unfair to ask [Dale] to sacrifice his relationship with the children because he cannot afford the cost of travel to a distant location chosen by [Kathryn]." But the court concluded, "The costs and logistical demands of relocation are real, but not insurmountable." Substantial evidence supports the court's finding that Dale may maintain a close bond with the children despite their relocation.

Finding of fact 2.3.9, regarding the alternatives to relocation and whether it is feasible and desirable for the other party to relocate:

Dale also disputes the trial court's findings that he did not ask to be the children's primary residential parent and that the evidence does not support making him the children's primary residential parent. Dale requested a modification of the parenting plan to "includ[e] a change in the residence in which the children reside the majority of the time." At trial, however, he did not ask to be the primary residential parent. Even if he had made this request, substantial evidence in the record supports the court's finding that he should not be the primary residential parent at this time.

-17-

Dale makes several other contentions that lack merit. He argues that Kathryn violated the relocation statute by failing to give written notice to her parents. But Diane Roberts's testimony at trial in support of relocation shows that she had notice, and Dale's technical argument fails. Dale also argues that the trial court erred procedurally when it entered a parenting plan in December 2013, after Kathryn had filed her notice of intended relocation but before the 2014 relocation trial. But if Dale objected to the entry of this parenting plan, his remedy was to file a timely appeal. He did not and may not raise this issue now.

Safeguards To Ensure Washington's Continuing Jurisdiction

Concerned about the costs and consequences of a future modification or relocation proceeding in Australia, Dale argues that the trial court should have taken steps to ensure the continuing jurisdiction of Washington courts over this matter. Citing two California cases, In re Marriage of Condon[28] and In re Marriage of Lasich,[29] Dale contends that Washington courts should require a concession of continuing jurisdiction and a substantial bond in cases of international relocation. Dale argues that a bond is necessary to ensure Kathryn's compliance with the parenting plan and to supply Dale with the funds he would need to litigate any future dispute.

---

[28] 62 Cal. App. 4th 533, 73 Cal. Rptr. 2d 33 (1998).
[29] 99 Cal. App. 4th 702, 121 Cal. Rptr. 2d 356 (2002), rejected on other grounds by In re Marriage of LaMusga, 32 Cal. 4th 1072, 88 P.3d 81, 12 Cal. Rptr. 3d 356 (2004).

The Washington Legislature enacted the relocation statute in 2000, 2 years after the California Court of Appeals decided <u>Condon</u>. In the last 14 years, it has not amended the CRA to limit its application to relocations within U.S. borders or to impose additional or different requirements for international relocations. We decline Dale's request that we usurp the legislature's authority to modify the CRA and do not adopt the mandatory provisions created in <u>Condon.</u>

We recognize, however, the additional concerns that an international relocation creates for a nonresidential parent. While the Hague Convention provides that where a child has been wrongfully removed from his or her "habitual residence," "the authority concerned shall order the return of the child forthwith,"[30] the Convention's provisions relating to a nonresidential parent's access rights do not use such mandatory language.[31]  This puts the nonresidential parent's visitation rights at some risk following even a lawful relocation.

Here, although the trial court considered all the required relocation factors and substantial evidence supports the court's findings, it did not incorporate in its

---

[30] <u>Hague Convention</u>, art. 12.

[31] <u>Hague Convention</u>, art. 21 ("An application to make arrangements for organizing or securing the effective exercise of rights of access <u>may be presented</u> to the Central Authorities of the Contracting States." (emphasis added)).

parenting plan certain stipulations Kathryn made both at trial and before this court at oral argument. Kathryn agreed that "the United States will always be the country of habitual residence of these children" for purposes of the Hague Convention and that modification of the parenting plan will occur only in Washington or the state where Dale resides. She testified that she intends it to be enforceable in either Washington or Australia and that if she fails to comply, Dale may file a motion for contempt in either jurisdiction. At oral argument, counsel confirmed that Kathryn intends Australia to have the authority to find her in contempt and to enforce such an order.

According to expert testimony at trial from an Australian family law attorney, Dale and Kathryn can make the Washington parenting plan enforceable in Australia by registering it "through the regulations that are provided for under the Family Law Act," making the order "most difficult . . . to disregard" or modify absent a significant change of circumstances. At oral argument, Kathryn told this court through counsel that she has registered the current parenting plan in Australia. In response to our question, counsel also confirmed that Kathryn would agree to maintain an agent in Washington for purposes of service of process.

Although the doctrine of judicial estoppel may prohibit Kathryn from taking a contrary position in future proceedings in Washington courts, we cannot predict

with confidence the application of this doctrine in foreign courts. Thus, we conclude that the parenting plan should be amended to include the cited stipulations Kathryn made both at trial and before this court at oral argument.

The trial court record does not affirmatively reflect the trial court's consideration of Dale's bond request. Contrary to Condon, we have declined to rewrite the CRA to include any mandatory requirements for international relocations. But we remand to the trial court to consider the merits of this request, including the relative burdens and benefits of a bond. In its discretion, the trial court may conduct an evidentiary hearing on this issue.

In this context, we note that Article 22 of the Hague Convention states, "No security, bond, or deposit, however described, shall be required to guarantee the payment of costs and expenses in the judicial or administrative proceedings falling within the scope of this Convention." But the Convention does not prohibit a bond imposed to guarantee performance of plan provisions and proceedings not falling with the scope of the Hague Convention.

Finally, the trial court should require that the amended parenting plan be registered with the Australian Family Law Court.

Motion to Strike

Dale filed with this court a motion to strike portions of Kathryn's brief and for sanctions. Dale could have addressed this issue in his reply brief in a few

-21-

sentences rather than filing a separate motion to strike. This course would have saved time and resources of the parties and the court without diminishing the quality of the decision-making process. We deny the motion.

Attorney Fees

Dale requests an award of attorney fees and costs on appeal. He argues that Kathryn has "the superior ability to pay" because she has "historically earned" more than Dale. Kathryn counters, "[Dale] is not entitled to attorney fees on appeal; [Kathryn] is."

RCW 26.09.140 provides that "after considering the financial resources of both parties," the court may order a party to pay a "reasonable amount" of the costs and attorney fees of the other party. When exercising our discretion under this statute, we consider the arguable merit of the issues on appeal and the parties' financial resources.[32] A party must timely file a financial declaration for this court to consider his or her resources.[33] RCW 26.27.511 states that the court "shall award the prevailing party . . . necessary and reasonable expenses." Dale filed an affidavit of financial need, but he is not a prevailing party, and his focus on Kathryn's "superior ability to pay" alone does not address the requirements of RCW 26.09.140 or RAP 18.1 to award fees. Kathryn's one sentence request without further support or argument does not adequately brief

---

[32] In re Marriage of C.M.C., 87 Wn. App. 84, 89, 940 P.2d 669 (1997).
[33] RAP 18.1(c).

this issue. A "bald request for attorney fees on appeal" with no argument is insufficient.[34] We decline to award appellate costs or attorney fees to either Dale or Kathryn.

## CONCLUSION

We remand to the trial court for amendment of the parenting plan to incorporate the parties' stipulations as noted in this opinion and require its registration with the Family Law Court of Australia. We also direct that on remand the court consider the bond issue. Because the trial court considered and made findings on the factors required by the relocation statute and substantial evidence supports the court's findings and conclusions, we otherwise affirm.

_Leach, J._

WE CONCUR:

_Spearman, C.J._    _Schindler, J._

---

[34] Thweatt v. Hommel, 67 Wn. App. 135, 148, 834 P.2d 1058 (1992).