IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Parentage of Adele Conley Rugh, | ) ) ) | No. 79195-8-I |
| MICHELLE CONLEY, | ) ) | |
| Respondent/Cross Appellant, | ) ) | |
| and | ) ) | |
| CHRISTOPHER RUGH, | ) ) | UNPUBLISHED OPINION |
| Appellant/Cross Respondent. | ) ) ) | |

VERELLEN, J. — Christopher Rugh appeals the trial court's findings of fact and order establishing a final parenting plan. He contends that, in the absence of RCW 26.09.191 restrictions, RCW 26.16.125 requires a court to grant each parent equal residential time and decision-making authority. Michelle Conley cross appeals, contending the trial court erred when it found Rugh did not engage in abusive use of conflict and allowed Rugh to petition for a future modification of the plan without a finding of adequate cause. Conley also claims the trial court's award of attorney fees to her was inadequate.

We affirm the trial court's order in all respects.

FACTS

Rugh and Conley had a brief dating relationship in 2014. After they broke up, they continued to occasionally see each other. Conley became pregnant, and they moved in together. Their child was born in May 2015. Approximately six months later, Conley and Rugh permanently ended their intimate relationship following an overseas trip in which each alleged the other assaulted them.

On March 2, 2016, after a lengthy mediation, the parties entered a "memorandum of agreement" under CR 2A addressing residential time and decision-making authority. On June 10, 2016, the parties filed an agreed parenting plan consistent with the CR 2A agreement. The plan granted both parents joint decision-making authority. It provided that the child would live with Conley, and Rugh would have residential time during the day on Sundays, Tuesdays and Thursdays, totaling 24 hours per week, or approximately 14 percent of total residential time. The plan provided Rugh's residential time would increase in August 2016 to approximately 32 hours per week, or 19 percent of total residential time, by adding one overnight weekend visit per week.

The plan did not make provisions for a residential schedule once the child became school-aged, nor provisions for summer or holiday schedules. These sections were all designated "reserved." Instead, the plan contained a statement that "[i]t is the intention of both parents that the father's residential time will expand

as the child gets older."[1]  The plan specified that Conley and Rugh would agree to review the residential schedule in May 2017 when the child turned two years old. The review would occur "without the necessity of establishing a substantial change in circumstances, or having a threshold hearing" and that any disputes would be resolved through mediation and arbitration.[2]

The parties did not review the parenting plan in this manner.  Instead, on February 21, 2017, Conley filed a notice of intent to relocate to Everett.  Conley also filed a proposal to modify the parenting plan.  As proposed by Conley, until the child turned three years old, Rugh would have residential time from Tuesday morning to Wednesday morning and every other weekend from Saturday morning to Sunday at noon, averaging 37.5 hours per week, or 22 percent of total residential time.  Once the child enrolled in preschool, the length of the weekend visit would increase, resulting in residential time averaging 46 hours per week, or 27 percent of total residential time.  Conley also requested sole decision-making authority.  She argued Rugh's residential time and decision-making authority should be limited under RCW 26.09.191 due to his abusive use of conflict.

Rugh objected to the relocation and to Conley's proposed parenting plan. He filed his own modification petition, in which he requested Conley's contact with the child be limited under RCW 26.09.191, alleging Conley had a history of

---

[1] Clerk's Papers (CP) at 6.

[2] Id.

domestic violence and assault, emotional problems, substance abuse, and abusive use of conflict. Rugh requested that his residential time be increased to every week from Tuesday morning until Thursday night and every other weekend from Saturday morning to Monday morning, giving both parents equal residential time. He requested to maintain joint decision-making authority.

On April 18, 2017, the court entered a temporary order allowing Conley to relocate to Everett pending trial. The court amended the existing parenting plan to give Rugh residential time from Tuesday morning to Wednesday afternoon and from Saturday evening to Sunday evening every other weekend. Under the court's temporary order, Rugh's residential time averaged 38.5 hours per week, or 23 percent of total residential time. The court provided that in all other respects, the existing parenting plan would remain in effect. The court consolidated Conley's petition for relocation and Rugh's modification petition for trial.

Prior to trial, Rugh petitioned twice more to modify the parenting plan. On October 17, 2017, a superior court commissioner pro tempore imposed a temporary residential schedule giving Rugh residential time from Tuesday morning to Wednesday evening and every other weekend from Friday morning to Sunday evening. Under this schedule, Rugh's residential time averaged 61.5 hours per week, or approximately 37 percent of residential time. Both parties sought to revise the commissioner's order.

On December 22, 2017, the superior court granted Rugh's motion in part and further increased Rugh's residential time to Wednesday morning to Friday

4

morning every other week, and Wednesday morning to Sunday night on alternating weeks, averaging 76 hours per week, or 45 percent of total residential time.

The superior court appointed a guardian ad litem (GAL), who conducted an investigation and issued a report. The GAL concluded that Conley and Rugh could not share residential time equally "due to the level of conflict and the likelihood of it continuing unless the father gets his way."[3] She recommended that during the school year, the child reside with Rugh every other weekend from Thursday morning to Tuesday evening and, in alternating weeks, from Tuesday morning to Wednesday evening, averaging 79 hours per week, or 47 percent of total residential time. In summer, the child would live with Rugh on alternating weeks from Thursday morning to Tuesday morning, averaging 60 hours per week, or 36 percent of total residential time. The GAL recommended the trial court make findings that Rugh had engaged in abusive use of conflict and assign sole decision-making authority to Conley.

Trial on the modification and relocation petitions took place in July 2018. The child was then three years old. After reviewing 161 exhibits and hearing testimony from 12 witnesses over five days, the trial court entered findings of fact and conclusions of law and a parenting plan. The trial court declined to impose restrictions on either parent pursuant to RCW 26.09.191. It carefully evaluated the

---

[3] CP at 1037.

5

factors in RCW 26.09.187 and concluded they were "essentially neutral in terms of favoring one parent over the other with regard to residential time."[4] It concluded that the distance between the parents' homes was the "deciding factor."[5] The trial court reasoned that "[a] child of this age simply cannot be shuttled back and forth for up to 90 minutes each direction multiple times a week."[6] The trial court also found that as the child got older, "it will not work to have the child in school 90 minutes away from the other parent with split residential time; the amount of driving to drop her off and pick her up each day during a party's residential time would be prohibitive."[7] Accordingly, the parenting plan provided that during the school year, the child would reside with Rugh on Wednesday afternoons and every other weekend from Friday afternoon to Tuesday morning, averaging 47 hours per week, or 28 percent of total residential time. In summer, the child would live with Rugh from Friday morning to Tuesday morning every other week and from Tuesday morning to Friday morning on alternating weeks, averaging 84 hours per week, or 50 percent of total residential time. The trial court ordered that if either parent moved to within 10 miles of the other, the parenting plan could be modified without a finding of adequate cause.

---

[4] CP at 1227.

[5] Id.

[6] Id.

[7] Id.

The trial court found that sole decision-making authority was necessary because of "the history of each parent's participation in decision making," "the parents' inability to cooperate with each other in decision making" and "the distance between the parents' homes makes it hard to make timely decisions together."[8]  Accordingly, the trial court granted sole decision-making authority regarding health and educational decisions to Conley but joint authority for all other decisions.  The court awarded Conley attorney fees in the amount of $20,650 based on Rugh's intransigence.[9]

Both Conley and Rugh moved for reconsideration.  On October 22, 2018, the trial court amended the parenting plan, changing the school-year schedule so the child would reside with Rugh every other Wednesday after school until Sunday evening and, in alternate weeks, from Wednesday after school until Friday morning, averaging approximately 71 hours per week, or 42 percent of total residential time.  In all other major respects, including the 50-50 residential schedule during the summer, the parenting plan remained the same.

Both Rugh and Conley appeal.

---

[8] CP at 1235.

[9] The court also awarded Conley $4,350 based on a prior finding of contempt against Rugh.

## STANDARD OF REVIEW

We review a trial court's parenting plan for abuse of discretion.[10] We defer to the trial court because of its unique opportunity to observe the parties, determine their credibility, and sort out conflicting evidence.[11] A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.[12]

Reviewing a trial court's findings of fact and conclusions of law is a two-step process.[13] First, we review the sufficiency of the evidence to determine whether the trial court's findings of fact are supported by substantial evidence in the record. "'Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise.'"[14] We then determine whether those findings of fact support the trial court's conclusions of law.[15] Credibility determinations are for the trier of fact and are not subject to review.[16]

---

[10] In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012).

[11] In re Marriage of Woffinden, 33 Wn. App. 326, 330, 654 P.2d 1219 (1982).

[12] Katare, 175 Wn.2d at 35.

[13] Landmark Dev., Inc. v. City of Roy, 138 Wn.2d 561, 573, 980 P.2d 1234 (1999).

[14] In re Marriage of Griswold, 112 Wn. App. 333, 339, 48 P.3d 1018 (2002) (quoting Bering v. SHARE, 106 Wn.2d 212, 220, 721 P.2d 918 (1986)).

[15] Landmark Dev., Inc., 138 Wn.2d at 573.

[16] In re Marriage of Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999).

RUGH'S APPEAL

Rugh's sole contention is that RCW 26.16.125 creates a statutory presumption that a parenting plan will grant each parent equal residential time and decision-making authority. He contends a trial court may deviate from this presumption only if it finds one parent's contact must be restricted pursuant to RCW 26.09.191. The trial court rejected this argument, as do we.

We review the meaning of a statute de novo.[17] We look first to the legislation's plain language, "considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole."[18] Statutory provisions and rules should be harmonized whenever possible.[19] Only if the statute is ambiguous do we apply traditional techniques of statutory construction.[20] "A statute is ambiguous when it is 'susceptible to two or more reasonable interpretations,' but 'a statute is not ambiguous merely because different interpretations are conceivable.'"[21]

The Parenting Act of 1987, chapter 26.09 RCW (Act), "fundamentally changed the legal procedures and framework addressing the parent-child

---

[17] Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wn.2d 1, 9, 43 P.3d 4 (2002).

[18] State v. Evans, 177 Wn.2d 186, 192, 298 P.3d 724 (2013).

[19] Emwright v. King County, 96 Wn.2d 538, 543, 637 P.2d 656 (1981).

[20] Christensen v. Ellsworth, 162 Wn.2d 365, 373, 173 P.3d 228 (2007).

[21] State v. Gonzalez, 168 Wn.2d 256, 263, 226 P.3d 131 (2010) (internal quotation marks omitted) (quoting Estate of Haselwood v. Bremerton Ice Arena, 166 Wn.2d 489, 498, 210 P.3d 308 (2009)).

relationship in Washington."[22]  The Act replaced the concepts of "visitation" and

"custody"—which tended to "treat children as a prize awarded to one parent and

denied the other"—with the more functional terms "parenting plan" and "residential

schedule."[23]

The Act contains several guiding principles.  RCW 26.09.002, the Act's

overarching policy statement, provides that any proceeding under chapter 26.09

RCW must be controlled, first and foremost, by the child's best interests:

> In any proceeding between parents under this chapter, the best
> interests of the child shall be the standard by which the court
> determines and allocates the parties' parental responsibilities.  The
> state recognizes the fundamental importance of the parent-child
> relationship to the welfare of the child, and that the relationship
> between the child and each parent should be fostered unless
> inconsistent with the child's best interests.  The best interests of the
> child are served by a parenting arrangement that best maintains a
> child's emotional growth, health and stability, and physical care.
> Further, the best interest of the child is ordinarily served when the
> existing pattern of interaction between a parent and child is altered
> only to the extent necessitated by the changed relationship of the
> parents or as required to protect the child from physical, mental, or
> emotional harm.

> RCW 26.09.184(1) identifies the seven objectives of a parenting plan as:

> (a) Provide for the child's physical care;

> (b) Maintain the child's emotional stability;

> (c) Provide for the child's changing needs as the child grows and
> matures, in a way that minimizes the need for future modifications to
> the permanent parenting plan;

---

[22] State v. Veliz, 176 Wn.2d 849, 855, 298 P.3d 75 (2013).

[23] Id.

(d) Set forth the authority and responsibilities of each parent with respect to the child, consistent with the criteria in RCW 26.09.187 and 26.09.191;

(e) Minimize the child's exposure to harmful parental conflict;

(f) Encourage the parents, where appropriate under RCW 26.09.187 and 26.09.191, to meet their responsibilities to their minor children through agreements in the permanent parenting plan, rather than by relying on judicial intervention; and

(g) To otherwise protect the best interests of the child consistent with RCW 26.09.002.

A parenting plan must contain a residential schedule and provisions for decision-making authority.[24] RCW 26.09.187(3) outlines the process by which a court shall establish a residential schedule.

First, the court must determine if RCW 26.09.191 restrictions apply. RCW 26.09.191(1) and (2) are mandatory provisions that require a court to restrict a parent's conduct or involvement under circumstances including abandonment, abuse, or domestic violence. RCW 26.09.191(3) is a discretionary provision that permits a trial court to restrict a parent's actions if any of the following factors exist:

    (a)    A parent's neglect or substantial nonperformance of parenting functions;

    (b)    A long-term emotional or physical impairment which interferes with the parent's performance of parenting functions as defined in RCW 26.09.004;

    (c)    A long-term impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting functions;

---

[24] RCW 26.09.184(5), (6)

11

(d)     The absence or substantial impairment of emotional ties between the parent and the child;

(e)     The abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development;

(f)     A parent has withheld from the other parent access to the child for a protracted period without good cause; or

(g)     Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

Where RCW 26.09.191 limitations are not dispositive of the residential schedule, a trial court considers the factors in RCW 26.09.187(3)(a):

(i)     The relative strength, nature, and stability of the child's relationship with each parent;

(ii)    The agreements of the parties, provided they were entered into knowingly and voluntarily;

(iii)   Each parent's past and potential for future performance of parenting functions as defined in RCW 26.09.004(3), including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;

(iv)    The emotional needs and developmental level of the child;

(v)     The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;

(vi)    The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and

(vii)   Each parent's employment schedule, and shall make accommodations consistent with those schedules.

The first factor, the relative strength, nature, and stability of the child's relationship with each parent, is the most important. A court may order that a child frequently alternate between residences "for brief and substantially equal intervals of time" if such a provision is in the child's best interests.[25] "In determining whether such an arrangement is in the best interests of the child, the court may consider the parties' geographic proximity to the extent necessary to ensure the ability to share performance of the parenting functions."[26]

RCW 26.09.187(2) outlines the criteria for decision-making. In considering whether to grant joint decision-making authority, the court considers (1) the existence of RCW 26.09.191 restrictions on a parent's involvement, (2) the history of each parent's participation in decision making, (3) whether the parents have a "demonstrated ability and desire to cooperate with one another," and (4) the parents' geographic proximity to one another "to the extent that it affects their ability to make timely mutual decisions."[27] A court must grant sole decision-making authority to one parent when it finds (1) there are grounds for RCW 26.09.191 restrictions on the other parent's involvement, (2) both parents are opposed to mutual decision making, or (3) one parent is opposed to mutual decision making and the opposition is "reasonable."[28]

---

[25] RCW 26.09.187(3)(b)

[26] RCW 26.09.187(3)(b).

[27] RCW 26.09.187(2)(c).

[28] RCW 26.09.187(2)(b).

As he did below, Rugh argues that RCW 26.16.125 creates a statutory presumption in favor of a 50-50 residential schedule. RCW 26.16.125 provides:

> <u>Henceforth the rights and responsibilities of the parents in the absence of misconduct shall be equal, and one parent shall be as fully entitled to the custody, control and earnings of the children as the other parent</u>, and in case of one parent's death, the other parent shall come into full and complete control of the children and their estate.

RCW 26.16.125 has remained functionally unchanged since its enactment in 1879.[29] Rugh argues that "in the absence of misconduct" means that, unless the court imposes RCW 26.09.191 restrictions, the court must order "substantially equal residential provisions and decision making."[30]

Relying on an unpublished Division Two case, <u>In the Matter of E.L.C.</u>,[31] the trial court rejected Rugh's argument:

> RCW 26.16.125 does not trump RCW 26.09. There is no statutory right to equal custody of a child that takes priority over the best interests of the child. A court order controls over RCW 26.16.125. The statute does not mandate equal time for visitation, nor does it create a presumption that visitation shall be equal.[32]

The court in <u>E.L.C.</u> relied on the Washington Supreme Court's opinion in <u>State v. LaCaze</u>, which held that the equal right to custody guaranteed by

---

[29] In 2008, the legislature amended the statute to substitute the word "one parent" or "other parent" for "mother" and "father."

[30] Appellant's Br. at 1.

[31] <u>In the Matter of E.L.C.</u>, No. 49112-5-III (Wash. Ct. App. Mar. 20, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2049112-5-II%20Unpublished%20Opinion.pdf.

[32] CP at 1230.

14

RCW 26.16.125 means that "in the absence of a court order, both [parents] share the right to custody even if the parents are living apart."[33] The court in E.L.C. also cited to its own opinion in Weber v. Weber,[34] which noted while RCW 26.16.125 gives both parents an equal "right" to custody, a trial court maintains the discretion to make residential placement decisions based on the child's best interests.

We agree with Division Two's analysis distinguishing "equal rights to custody" from "equal residential time." As chapter 26.09 RCW repeatedly makes clear, a trial court has broad discretion to develop a parenting plan, which may or may not grant each parent equal residential time. RCW 26.09.002 provides that the parenting plan must be guided, first and foremost, by the "best interests of the child." And it requires a trial court to fashion a parenting plan that best replicates the existing parenting arrangement unless changes are necessary to protect the child from harm, or due to "the changed relationship of the parents."[35] RCW 26.09.187(3) requires a trial court to incorporate multiple considerations into a residential schedule, particularly the child's relationship with each parent. The statute thus clearly vests the trial court with discretion to award unequal residential time even in the absence of RCW 26.09.191 restrictions.

Rugh provides no Washington authority to support his argument that RCW 26.16.125 takes priority over the best interests of the child and the criteria

---

[33] 95 Wn.2d 760, 763, 630 P.2d 436 (1981) (emphasis added).

[34] 6 Wn. App. 722, 725-26, 496 P.2d 576 (1972).

[35] RCW 26.09.002.

set forth in RCW 26.09.187(3).[36] We thus reject Rugh's claim that RCW 26.16.125's reference to equal <u>rights</u> to a child compels a court to award each parent equal <u>time</u> with that child. Such an interpretation would render superfluous the provisions allowing a trial court to tailor a residential schedule to reflect each family's unique circumstances. For the same reason, RCW 26.16.125 does not require a trial court to grant joint decision making in the absence of RCW 26.09.191 restrictions. The plain language of the statute does not support Rugh's interpretation.[37]

CONLEY'S CROSS APPEAL

1. <u>Abusive Use of Conflict</u>

Conley argues that the trial court erred by finding Rugh had not engaged in an abusive use of conflict. Conley is incorrect.

RCW 26.09.191(3) provides that a court may preclude or limit any provision of the parenting plan if the parent's involvement or conduct has "an adverse effect on the child's best interests." The statute provides a nonexclusive list of factors

---

[36] Only a small number of cases address RCW 26.16.125 at all, most of which date to the first half of the last century.

[37] Even if RCW 26.16.125 could be read to conflict with chapter 26.09 RCW, and that conflict could not be resolved by the plain statutory language, the provisions in chapter 26.09 RCW governing parenting plans would control because a specific statute controls over a general statute. <u>See</u> <u>In re Est. of Kerr</u>, 134 Wn.2d 328, 343, 949 P.2d 810 (1998) ("'A more specific statute supersedes a general statute <u>only</u> if the two statutes pertain to the same subject matter and conflict to such an extent that they cannot be harmonized.'") (quoting <u>Omega Nat'l Ins. Co. v. Marquardt</u>, 115 Wn.2d 416, 425, 799 P.2d 235 (1990)).

that may constitute an adverse effect on the child's best interests, including "[t]he abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development."[38]

The trial court found, "There is insufficient evidence of an effect on the child to find [a]busive [u]se of [c]onflict by either party."[39] Conley contends the trial court relied on the wrong legal standard in making this finding. She contends the trial court required her to prove Rugh's actions had an "effect on the child," but that she was only required to prove Rugh's actions created the "danger of serious damage" to the child.[40]

A trial court abuses its discretion when it applies an incorrect legal standard.[41] The statute clearly requires that RCW 26.09.191(3) restrictions may be imposed only if the parent's involvement or conduct has "an adverse effect on the child's best interests." One way this can manifest is an abusive use of conflict if that conflict "creates the danger of serious damage to the child's psychological development."[42] Thus, to impose RCW 26.09.191(3) restrictions for abusive use of conflict, the court must find both that the conflict has an adverse effect on the

---

[38] RCW 26.09.191(3)(e).

[39] CP at 1230.

[40] Respondent/Cross Appellant's Br. at 23.

[41] In re Marriage of Rostrom, 184 Wn. App. 744, 750, 339 P.3d 185 (2014).

[42] RCW 26.09.191(3)(e).

child's best interests and that the conflict creates a danger of serious psychological damage to the child.

The trial court did not err in considering the effect on the child. Conley fails to establish that the trial court's refusal to find abusive use of conflict was error.

Conley argues that Rugh "made derogatory statements about the mother in front of the child" and "made derogatory statements about her home and her neighborhood."[43] The only such statements Conley cites in her brief are an incident in February 2017 when the child was approximately 21 months old, where Rugh and Conley got into an argument, Conley kicked a screw at Rugh, and Rugh threw it at her car. Rugh told the child to "tell Mommy that you don't want to live in white trash Everett."[44] She also noted an incident sometime after April 2017, around the time of Conley's move to Everett, when Rugh attempted to drop off the child early, Conley was still asleep, and Rugh, in front of the child, said "her mommy wasn't there for her, so she's upset."[45]

The trial court made detailed findings about the parents' animosity towards each other:

> More than anything, this litigation appears to be the result of a power struggle. The parties are frequently intractable in their positions regarding the child and the particulars of visitation. There is no compromise. When minor parenting plan violations occur, the violating parent will not back down. The other parent then responds

---

[43] Respondent/Cross Appellant's Br. at 23.

[44] Id. at 5 (citing Report of Proceedings (RP) (July 25, 2018) at 523).

[45] Id. (citing RP (July 26, 2018) at 730).

with what can only be described as revenge, using the child's schedule as a weapon.[46]

The court found that Rugh "on at least two occasions has made statements in front of the child, with [Conley] present, that are critical of [Conley's] parenting."[47] The court also found that Rugh "feels like [Conley] is holding the child 'hostage' from him, that she tries to 'trick' him out of money, that the motion to relocate was a disguised 'hostile takeover,' and that he should not have had to respond to discovery demands such as three years of financial records because it was 'unreasonable' and 'harassment.'"[48]

However, the court also found that Conley was equally responsible for the disputes:

> For her part, petitioner cannot seem to converse with respondent in person, by email, or by text without escalating their arguments. She has denied the respondent guaranteed Skype time with the child when it "didn't meet our schedule" and yelled at him in front of the child. She ignored a parenting plan provision for joint decision making when she visited several potential preschools without involving respondent. Petitioner has consistently refused respondent additional visitation time, even of short periods, or to trade visitation time, apart from what is in the parenting plan. That is her right, but it highlights the inflexibility that is completely the opposite of respondent's expectations. . . . She can be argumentative, escalate tension, and insult petitioner in writing and texts.[49]

---

[46] CP at 1225.

[47] Id.

[48] Id.

[49] CP at 1223, 1227.

Conley does not challenge these findings, and they are verities on appeal.[50]

Given the circumstances of this case, Conley fails to establish that the trial court applied an incorrect legal standard or otherwise abused its discretion.

2. Future Modifications of the Parenting Plan

Conley contends the trial court erred when it allowed parties to seek a future modification of the parenting plan without a finding of adequate cause. Again, Conley fails to demonstrate error.

At trial, Rugh testified if the trial court granted the relocation petition, he would move to Everett as well. After outlining the residential schedule, the parenting plan provided: "Should either party move to within 10 miles of the other, a motion for adjustment or modification may be filed without a finding of adequate cause."[51]

Conley argues the trial court's ruling "violated the provisions of RCW 26.09.260 by reducing the father's burden of proof for a parenting plan modification."[52] RCW 26.09.260 requires that a court may not modify a parenting plan unless it finds that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of

---

[50] Conley devotes only a few sentences to this finding in her brief, stating that her decision to investigate possible daycares and her refusal to give the father residential time beyond that in the temporary parenting plan were not "cause for criticism." Appellant's Br. at 23. But even if Conley had adequately challenged the trial court's findings on this issue, the record supports the findings.

[51] CP at 1236.

[52] Respondent/Cross Appellant's Br. at 20.

the child. RCW 26.09.270 requires that a party seeking to modify a parenting plan must first establish adequate cause for a hearing on the modification. "When a parent petitions for modification of an existing parenting plan, RCW 26.09.270 requires the trial court to first determine, based on affidavits submitted by the parties, whether adequate cause exists to justify a full modification hearing."[53] "The primary purpose of the threshold adequate cause requirement is to prevent movants from harassing nonmovants by obtaining a useless hearing."[54]

Here, the trial court did not relieve Rugh of his burden under RCW 26.09.260 to establish a substantial change in circumstances and that a modification would be in the child's best interests. The trial court waived only the need for a separate hearing and a finding of adequate cause. This is a finding required under RCW 26.09.270, which Conley does not address. Nothing in the court's language indicates any intention to relieve either party of the substantive requirements of RCW 26.09.260. Conley fails to establish error.[55]

---

[53] In re Parentage of Jannot, 149 Wn.2d 123, 124, 65 P.3d 664 (2003).

[54] In re Marriage of Adler, 131 Wn. App. 717, 724, 129 P.3d 293 (2006).

[55] Conley also assigns error to the portion of the parenting plan governing the summer and holiday schedule, contending that it was "confusing and inconsistent." Respondent/Cross Appellant's Br. at 1, 2. However, Conley does not address these assignments of error in her brief's argument section, therefore, we consider any argument waived. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

### 3. Attorney Fees at Trial

Conley challenges the amount of the attorney fees awarded her at trial. She contends it was inadequate to compensate her for the extent of Rugh's intransigence or to deter future intransigent conduct.

The trial court made findings of fact as follows regarding Rugh's intransigence:

> With regard to respondent's intransigence: Respondent asked for modification of the "final" agreed parenting plan 16 times in 1-1/2 years. Once petitioner filed a motion to relocate and respondent filed a motion to modify, respondent ignored discovery requirements. He left all but one income section (liquid assets) of his initial financial disclosure blank. He twice failed to comply with discovery orders by the court, both times refusing to provide financial records regarding his companies and investments. He moved for a protective order and was denied. He later again moved for a protective order and again was denied. When he did partially comply with the discovery requests, far past the deadline, his answers were largely evasive and incomplete, for example, refusing to provide the name of a financial institution or answering by telling petitioner to look at other documents. Most of the "answers" appear actually to be refusals to answer or in the nature of game-playing. He was found in contempt. He asked for enforcement of the cohabitation agreement with petitioner after living apart from petitioner for years. That motion was denied. He filed a myriad of motions over the course of the litigation where, if he lost, he asked for revision, then, if he lost, asked for reconsideration. He took one ruling up for discretionary review before the Court of Appeals and was denied. All of these motions required responses by petitioner. Respondent did not answer the GAL's questions when he did not consider them relevant to her investigation. On petitioner's abilities as a mother, he said if he had an opinion, "I wouldn't tell you." He filed 239 interrogatories in this case. There is no dispute that the attorney fees for this litigation – over a parenting plan, essentially – exceed $300,000. The court has little doubt they will continue to increase. There is a line between aggressive litigation and intransigence, and respondent crossed it.[56]

---

[56] CP at 1398-99.

Intransigence is behavior that makes litigation unduly difficult and unnecessarily expensive.[57] It includes litigiousness, pursuing meritless appeals for the purpose of delay and expense, "foot-dragging, obstructing, filing unnecessary or frivolous motions, refusing to cooperate with the opposing party, noncompliance with discovery requests, and any other conduct that makes the proceeding unduly difficult or costly."[58] A continual pattern of obstruction can include refusing to cooperate with the GAL,[59] or resisting discovery and providing only incremental disclosure of income.[60] Rugh engaged in intransigence.

As a result of Rugh's intransigence, the trial court awarded Conley $20,650 in attorney fees.

A court may enter an award of fees when one party's intransigence causes the other party to incur additional legal costs.[61] We review the amount and reasonableness of an attorney fee award for an abuse of discretion.[62]

Here, Conley cites to no portion of the record detailing the attorney fees she expended specifically responding to Rugh's intransigence. Without such a record,

---

[57] In re Marriage of Wixom, 190 Wn. App. 719, 725, 360 P.3d 960 (2015).

[58] Id.

[59] In re Marriage of Crosetto, 82 Wn. App. 545, 564 n.5, 918 P.2d 954 (1996)

[60] In re Marriage of Mattson, 95 Wn. App. 592, 605-06, 976 P.2d 157 (1999).

[61] In re Marriage of Foley, 84 Wn. App. 839, 846, 930 P.2d 929 (1997).

[62] Taliesen Corp. v. Razore Land Co., 135 Wn. App. 106, 141, 144 P.3d 1185 (2006).

we cannot determine that the amount awarded was unreasonable. Conley's speculation that the amount was too low to discourage Rugh from continued intransigence is equally unsupported by the record. Conley fails to demonstrate that the amount of the fee award was an abuse of discretion.

## ATTORNEY FEES ON APPEAL

Conley requests attorney fees on appeal pursuant to RAP 18.1 and RCW 26.09.140. Under RAP 18.1, we may award attorney fees if authorized by applicable law. RCW 26.09.140 provides for attorney fees on appeal, considering the arguable merit of the issues on appeal and the parties' financial resources. We exercise our discretion and decline to award fees in this case.

We affirm the court's order in all respects.

WE CONCUR: